Eugene F. JONES

v.

**INTERNATIONAL INVENTORS INCORPORATED EAST, d/b/a International Inventors, Incorporated, also d/b/a International Inventors of Ga., also d/b/a International Inventors of Ga., Inc.**

**Civ. A. No. 75–1978.**

United States District Court,
N. D. Georgia,
Atlanta Division.

Nov. 4, 1976.
On Motion For Reconsideration
Feb. 3, 1977.

Ralph E. Carlisle, William R. Carlisle, Decatur, Ga., for plaintiff.

Don G. Gaskill, Snellville, Ga., for defendant.

## ORDER

RICHARD C. FREEMAN, District Judge.

This is an action for damages brought pursuant to § 10(b) of the Securities and Exchange Act of 1934 [hereinafter the "34 Act"], 15 U.S.C. § 78j, Rule 10b–5 of the Securities and Exchange Commission promulgated pursuant thereto, 17 C.F.R. § 240.10b–5, and § 12 of the Georgia Securities Act of 1973, Ga.Code Ann. § 97–112. Plaintiff also seeks damages for common law fraud and deceit. Jurisdiction is allegedly grounded upon § 27 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78aa. The action is presently before the court on defendant's motion to dismiss for lack of subject matter jurisdiction and/or for summary judgment.

Before turning to the merits of the motion *sub judice*, a brief review of the salient factual allegations contained in the complaint is warranted. In his complaint, plaintiff alleges that defendant utilized the means and instrumentalities of interstate commerce, including the mails and newspapers, in connection with the offering for purchase and sale of a "security." Plaintiff alleges that he responded to a newspaper advertisement contained in *The Atlanta Journal* and *The Atlanta Constitution*, and that he invested $250.00 in an investment scheme whereby defendant agreed to exercise all necessary managerial and sales efforts in connection with the marketing of an invention that plaintiff submitted, in return for which plaintiff and defendant would ultimately divide the proceeds from the sale and/or licensing of the invented device should the defendant decide to promote it. For the initial investment of $250.00, defendant agreed to investigate the potential marketability of the invention, and when plaintiff's invention received a positive evaluation, he was requested to submit an additional $956.00. Plaintiff further alleges that contrary to the defendant's representations, the defendant had neither the intention nor the capability of marketing the invention, and that the instant scheme was nothing more than an effort to defraud plaintiff of money in violation of state and federal securities laws that also constitutes actionable common law fraud and deceit.

Defendant's motion to dismiss for lack of subject matter jurisdiction is grounded upon its contention that the contract or agreement at issue did not constitute a "security" within the meaning of the relevant securities laws, since it constitutes nothing more than a "service contract" whereby defendant merely agreed to perform evaluative studies of inventions submitted to it. In sum, the defendant contends:

the services agreed to be performed by International Investors, Inc. were evaluative; there was no investment in a common enterprise. The Defendant only agreed to perform marketing services, not to produce profits for the Plaintiff in a common investment enterprise.

Defendant's characterization of the agreement and the evaluation and marketing schemes proposed by the defendant

as a mere "service contract" and therefore not a "security" is somewhat overly simplistic in light of the fact that it is well settled that:

> in searching for the meaning and scope of the word "security" in the Act[s], form should be disregarded for substance and the emphasis should be on economic reality.

*Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). *See also SEC v. W. J. Howey Co.*, 328 U.S. 293, 298, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) [1] [hereinafter "*Howey*"]; *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 352–353, 64 S.Ct. 120, 88 L.Ed. 88 (1943). Section 3(a)(10) of the '34 Act, 15 U.S.C. § 78c(a)(10), defines the term "security" in sufficiently broad and general terms to include within its definition various types of instruments that fall within the ordinary concept of a "security" in the commercial world and includes in relevant part:

> any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, . . . investment contract, . . . certificate of deposit, for a security, or in general, any interest commonly known as a "security";

■ In *Howey, supra,* the Supreme Court enunciated the landmark definition of an "investment contract", defining it to be: [a] contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of a promoter or a third party . . .

328 U.S. at 298–99, 66 S.Ct. at 1103. *Accord, Tcherepnin v. Knight, supra,* 389 U.S. 332, 338, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). Thus, under *Howey* the *sine qua non* of an investment contract is the coalescence of three elements: (1) an investment of money, (2) a common enterprise, and (3) "a reasonable expectation of profits to be derived from the entrepreneurial or management efforts of others." *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975). The instant action presents the novel question of whether an inventor, who invests money in a company to evaluate the saleability of his invention, with the ultimate hope that the company will undertake to market the invention and split any profits from licensing or other sale of that invention with the investor, has purchased or been offered an "investment contract" within the meaning of the federal securities laws.

At the outset, we note that the agreement between the parties or at least the proposal offered the plaintiff, of course, contemplated an investment of money, whether it be the initial $250.00 for the evaluation of the invention and/or the additional $926.00 requested by the defendant as payment for such services as preparing the Manufacturer's Submission Brochure and Manufacturer's Presentation Manual, after plaintiff's invention received a positive evaluation.[2] The more difficult ques-

---

**1.** Interestingly, in *Howey*, the touchstone of the "investment contract" therein was the existence of an optional management agreement, in the sense that the court found that the feasibility and success of the enterprise, in attracting individuals to invest, and in cultivating, harvesting, and marketing the citrus product, rested upon the availability of the Howey Company's management. 328 U.S. at 300, 66 S.Ct. 1100. Thus, the fact that what the investors had purchased was nominally an interest in real estate did not preclude the court from finding that the investors had purchased a "security." In a similar vein, the investment of money herein in consideration for a so-called "service contract" does not *ipso facto* preclude the applicability of the federal securities laws.

**2.** While it is clear from the record that plaintiff never formerly executed the defendant's standard form contract, several of the relevant provisions are set out below:

> 1. To secure the services and considerations furnished by the COMPANY as outlined in this Agreement, the Inventor agrees to pay the sum of *$956.00* in advance to the COMPANY. This amount shall be considered complete and full payment for the following: (1) If applicable, filing with the Patent Office under the Disclosure Document Program (2)

tions, and those which the parties have somewhat inadequately and only superficially addressed is (1) whether the scheme involved a common enterprise and (2) moreover, whether the inventor-plaintiff's expectation of profit was to come solely from the efforts of others, in light of the fact that he made the initial creative and inventive contribution, with the result that the ultimate success of defendant's efforts would at first blush appear to depend upon the relative merits of the invention.

 Turning first to the "common enterprise" element, it is somewhat unsettled whether a "common enterprise" may exist within the meaning of *Howey* where the agreement or scheme involves only one investor and the promoter. *Compare Sunshine Kitchens v. Alanthus Corp.,* 403 F.Supp. 719 (S.D.Fla.1975) *with Huberman v. Denny's Restaurant,* 337 F.Supp. 1249 (N.D.Cal.1972).[3] On the other hand, it is well settled in this circuit that the fact that one investor's return is independent of that of other similar investors does not preclude satisfaction of the common enterprise element, if the fortunes of all the investors are, in the last analysis, dependent upon the

efficacy of the promoter's efforts. *See, e. g., SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473 (5th Cir. 1974); *SEC v. Continental Commodities Corp.,* 497 F.2d 516 (5th Cir. 1974). Thus, it is not significant whether the profits of the enterprise will be pooled and distributed among all the investors and the promoter, but rather the emphasis should be on "the uniformity of impact of the promoter's efforts" on the fate of all the investors. *Id.* at 479; *SEC v. Continental Commodities Corp., supra,* at 522; *SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476, 482 (9th Cir. 1973), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53. *See also Howey, supra,* 328 U.S. at 300, 66 S.Ct. 1100. To illustrate, *SEC v. Koscot Interplanetary, Inc., supra,* involved the Koscot scheme of multi-level distributorships, wherein each investor's profit materialized only when the prospects *he* attracted to Opportunity Meetings were enlisted as distributors or sub-distributors. The Court of Appeals, nevertheless, deemed the commonality requirement to be present despite the fact that each investor's return was independent of the other, since the expectations and ultimate profit of all in-

If applicable, a patent search (3) A Manufacturer's Submission Brochure, defined as including, but not limited to a product description, a drawing or drawings, cost data, special features, patent status and retail potential. This brochure will be sent to manufacturers with whom we have direct contact through our past association with BART INDUSTRIES to manufacturers with whom we have contact through our professional services and to manufacturers with whom we have direct contact through our past associations (4) Exposure at trade shows which we attend (6) Upon indication of interest by manufacturer's Presentation Manual which will include the following: 1. Introduction 2. History and background 3. Potential and Planning Program 4. Sales data 5. Proposal

. . .

\* \* \* \* \* \*

4. COMPANY agrees to use best energies, skills, and efforts to present INVENTOR'S developed idea or invention in the form of a Manufacturer's Presentation Brochure to selected manufacturers for the purpose of negotiating a sale or licensing agreement. INVENTOR agrees that the extent of development and the number and selection of manufacturers contacted are to be at the discretion

of the COMPANY . . . COMPANY will negotiate an amount *to be paid by manufacturer* to COMPANY equal to 20% of that negotiated royalty paid to the INVENTOR for each of the first two years of the licensing agreement and equal to 10% for each year thereafter that the licensing agreement is in effect, or, if a cash sale, an amount equal to 20% of the cash sale paid to INVENTOR.

3. *Huberman v. Denny's Restaurants, Inc., supra,* involved a sale of property designed primarily for restaurant use by a developer to a private investor subject to a long-term lease to a restaurant chain. The lease provided the investor with a minimum annual rental as well as a percentage overall rental feature based upon the restaurant lessee's gross income. The court held that both the plaintiff and the defendants—the developer and the restauranteur—had a "common interest in the success of the venture," in the sense that, the plaintiff as owner had an interest in her minimum annual rental as well as a "significant interest in the amount of additional rent that was dependent upon the volume of restaurant sales" while the lessee had an interest in the successful operation of its own restaurant business. *Id.* at 1251.

124

vestors were "inextricably tied to the efficacy of the Koscot prospects and consummating a sale." *Id.* at 479. In sum, the absence of pooling or pro-rata sharing of profits is not critical to a finding of commonality. *Id.; SEC v. Continental Commodities Corp., supra.*[4] *Accord, Blackwell v. Bentsen,* 203 F.2d 690, 691–92 (5th Cir. 1953), *cert. dismissed,* 347 U.S. 925, 74 S.Ct. 528, 98 L.Ed. 1078. *SEC v. Glenn W. Turner Enterprises, supra,* at 482. Applying these principles to the instant action, it is evident that plaintiff has satisfied its burden with respect to the common enterprise requirement, since although plaintiff's expectation of profits was independent of those of other inventors who participated in the scheme, it is, nevertheless, clear that the fate of plaintiff and other investors was inextricably tied to the marketing and promotional efforts assumed and promised by the defendant in soliciting manufacturers to buy or license their inventions.

 The second apparent deficiency in the scheme which may be fatal to the application of the *Howey* test is whether it can reasonably be concluded that plaintiff's ultimate chance for profits is dependent *solely* upon the efforts of others, in view of plaintiff's initial and undoubtedly significant contribution to the enterprise—his invention. While some courts have adopted a very strict and literal approach to the definition of "solely", that is, by foreclosing security status on account of any inconsequential investor participation in the promotional scheme, *see, e. g., Chapman v. Rudd Paint and Varnish Co.,* 409 F.2d 635 (9th Cir. 1969), this ci. cuit and several other circuits have adopted a much more flexible and pragmatic view of the sole reliance element, holding that the critical inquiry is:

> whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial

efforts which affect the failure or success of the enterprise.

*SEC v. Glenn W. Turner Enterprises, Inc., supra,* at 482. *Accord, SEC v. Koscot Interplanetary, Inc., supra,* 497 F.2d at 483. Applying the relevant test to the facts herein, it is evident that while the novelty or inherent value of the investor's invention, of course, determines to some extent whether the product or creation can be successfully marketed and sold, the investor's invention may be deemed to be merely part and parcel of the initial investment which he contributed to the enterprise, rather than as any significant participation in the investment scheme itself. In this respect, it has been held that "the scheme is no less an investment contract merely because [the investor] contributes some effort as well as money to get into it." *SEC v. Glenn W. Turner Enterprises, Inc., supra,* 474 F.2d at 482; *SEC v. Koscot Interplanetary, Inc., supra,* 497 F.2d at 485. Viewing the defendant's scheme of evaluating and marketing inventions as a whole, it is clear that defendant was offering a pre-packaged investment contract in which plaintiff had the opportunity to share in the profits if the defendant's marketing and promotional efforts were ultimately successful, and plaintiff's sole expectation of profit from the enterprise, once he turned over the invention to the defendant, was dependent solely upon the defendant's acumen in promoting the invention. Indeed, once the investor paid his evaluation fee and out-of-pocket initial cost expenses, defendant would become plaintiff's "exclusive" marketing agent for developing and marketing the concept, and the "extent of development, [and] the number and selection of manufacturers contacted [were] to be at the discretion of the company." The sample contractual agreements submitted by defendant indicate a scheme in which once the defend-

---

**4.** *SEC v. Continental Commodities Corp., supra,* held that options on commodities futures contracts were within the *Howey* definition of a security. The common enterprise element was satisfied because "the success of the trading enterprise as a whole and customer investments individually is contingent upon the saga-

cious investment counseling of Continental Commodities." *Id.* at 522–23. Despite the fact that the defendant gave individual advice to each investor, the Fifth Circuit held that all investors depended on the defendant's expertise and where, therefore, involved in a common enterprise.

ant began to develop and market the invention, the only control right retained by the investor-inventor was his right to refuse to accept any license agreements or other offers procured by defendant's efforts, if such refusal were in the best interest of the inventor. This mere veto power, when viewed in conjunction with the company's exclusive and unfettered discretion in making the essential managerial decisions, including the selection of the manner of development and marketing, selection of the target manufacturers to whom the concept or invention would be introduced,[5] the determination of the extent to which it would pursue the exploration of any such opportunities leads to the inexorable conclusion that plaintiff had neither the right nor the ability to participate to any significant degree in the decisions which would affect the outcome of the enterprise. *Cf. Parvin v. Davis Oil Co.,* 524 F.2d 112 (9th Cir. 1975) (investor's right to decide whether to continue drilling for oil past the casting point was not sufficient investor control to preclude finding of an investment contract, in view of the otherwise total control exercised by the promoter). In sum, the degree of investor control herein is not sufficient to take it out of the investment contract mold. Accordingly, for the reasons hereinabove expressed, defendant's motion to dismiss for lack of subject matter jurisdiction under the federal securities laws is hereby DENIED.

Defendant's motion for summary judgment with respect to the common law fraud and deceit count is predicated upon the purported integration clause in the contract, which states that the written terms constitute the entire agreement of the parties and that any verbal statements not specifically incorporated therein have no effect. Defendant contends that because of the integration clause, plaintiff may not rely upon any alleged fraudulent oral misrepresentations, but could only set aside the contract or recover damages if the alleged fraud were of the nature that prevented plaintiff from reading the contract. *See, e.*

*g., Sloan v. Farmers, etc., Bank,* 20 Ga.App. 123, 92 S.E. 893 (1917); *Thomas v. Eason,* 208 Ga. 822(3), 69 S.E.2d 729 (1952). Irrespective of the correctness of these statements as abstract principles of law, it is clear that such rules have no application herein since defendant in his answers to interrogatories has conceded the plaintiff never executed the particular form agreement containing the integration clause *sub judice.* In light of the foregoing, defendant's motion for summary judgment on the fraud and deceit count is hereby DENIED

In sum, the court has today (1) DENIED defendant's motion to dismiss for lack of subject matter jurisdiction and (2) DENIED defendant's motion for summary judgment.

IT IS SO ORDERED.

## ON MOTION FOR RECONSIDERATION

This is an action for damages brought pursuant to § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j [hereinafter the "34 Act"], Rule 10b–5 of the Securities and Exchange Commission promulgated pursuant thereto, 17 C.F.R. § 240.10b–5, and § 12 of the Georgia Securities Act of 1973, Ga.Code Ann. § 97–112. Plaintiff further seeks damages for common law fraud and deceit. On November 4, 1976, this court entered an order denying defendants' motion to dismiss for lack of subject matter jurisdiction under the federal securities laws holding that the invention analysis and marketing scheme *sub judice* constituted an investment contract, or in other words, was a "security" within the meaning of § 3(a)(10) of the '34 Act, 15 U.S.C. § 78c(a)(10). This court further denied one of the defendant's motions for summary judgment. The action is presently before the court on defendants' second motion to dismiss for lack of federal subject matter jurisdiction and amended motion for summary judgment, which amplify defendants' previous motions, and which we, therefore, construe as a motion for reconsideration of this court's previous order.

---

**5.** Defendant's discretionary duties were, of course, subject to a "best efforts" requirement.

## SUBJECT MATTER JURISDICTION

The facts of the instant action are more fully set out in this court's earlier order and thus only a brief review of the jurisdictional facts is warranted. Plaintiff has alleged that defendant used the instrumentalities of interstate commerce to market a promotional scheme for the evaluation and marketing of certain inventions. Essentially, plaintiff responded to advertisements whereby defendant agreed to investigate the potential saleability of an invention for $250.00 [hereinafter "the evaluation contract"]; thereafter, if the market analysis of the invention was positive, the inventor could sign an additional agreement whereby for the additional sum of $956.00, the defendant would use its "best efforts" to secure patents, contact manufacturers, secure licenses and otherwise attempt to either market the invention or sell and license the invention [hereinafter the "marketing contract"]. Any license fees or profits obtained through the defendant's efforts would thereafter be split proportionately. Accordingly, this court framed the critical issue as follows:

> whether an inventor, who invests money in a company to evaluate the saleability of his invention, with the ultimate hope that the company will undertake to market the invention and split any profits from licensing or other sale of that invention with the investor, has purchased or been offered an "investment contract" within the meaning of the federal securities laws.

In reaching an affirmative answer to the question posited, this court noted that all the elements of an investment contract were present, that is, an investment of money, in a common enterprise with a "reasonable expectation of profits to be derived from the entrepreneurial or management efforts of others." *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975);

*SEC v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).

 Defendants raise a two-pronged argument in connection with the question of subject matter jurisdiction. In the first instance, they contend that since claims for punitive and exemplary damages are not cognizable under the federal securities laws,[1] the only damages that plaintiff could ultimately recover is $250.00, or the consideration he paid to the defendant for the marketing evaluation. Accordingly, they conclude that plaintiff has not alleged the jurisdictional prerequisite of an amount in controversy exceeding $10,000.00. It is true that in actions in which federal jurisdiction is predicated upon the existence of a federal question, a plaintiff must allege in good faith that the amount in controversy exceeds $10,000.00, 28 U.S.C. § 1331(a); however, the federal securities statutes including the 1934 Act include their own jurisdictional bases, which contain no reference to the amount in controversy. Therefore, the amount in controversy is immaterial to subject matter jurisdiction in federal securities cases, *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940), and, accordingly defendants' contention in this respect is wholly without merit.

Defendants' second argument, however, is somewhat more appealing. In the first instance, defendant contends that any purported investment scheme offered by the defendant consisted of two entirely separate, distinct, and divisible parts, that is, the evaluation contract and the marketing contract. The former contract contained a provision stating that ["International Inventors, Inc., East"] assumes no responsibility or obligation beyond a fair and thorough evaluation and make[s] no guarantee that the invention will be produced or marketed." Moreover, it is undisputed that plaintiff never executed the second contract which contained provisions relating to the

1. *E.g., Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680 (5th Cir. 1971); *Globus v. Law Research Service, Inc.*, 418 F.2d 1276 (2d Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93; *de Haas v. Empire Petroleum Co.*, 435 F.2d 1223, 1229 (10th Cir. 1970).

defendant's agreement to use best efforts in marketing and promoting the invention. Thus, the primary defendant herein, International Inventors of Georgia [hereinafter the "Georgia Company"] is allegedly merely an independent contractor, franchisee, and license holder of International Inventors, Inc., East [hereinafter the "Virginia Corporation"], which recruits prospective inventions and that only the latter corporation could execute or be obligated to perform its best efforts in marketing the invention. In sum, the Georgia company contends that if a "security" or investment contract can be dredged from the instant promotional scheme, it must be found in the marketing contract, which was never executed by the plaintiff herein.

While we find defendants' arguments in this respect intriguing, they are wholly formalistic and certainly inconsistent with the umbrella of investor protection afforded by the securities laws. Indeed, similar arguments were foreclosed by the Supreme Court's decision in *SEC v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). In that decision, one of the defendants, W. J. Howey Co., sold to the public certain orange grove tracts in Florida; however, Howey Company told potential investors that it was not feasible to invest in the groves unless some sort of service arrangements were made to harvest the oranges. Although the purchaser was free to make his own arrangements for servicing, Howey-in-the Hills Service, Inc., a corporation related to the developer Howey Company, actually serviced about 85% of the acreage under a service contract, distinct from the original purchase agreement.

Noting that the definition of an investment contract for federal securities act purposes was flexible and capable of adaptation to meet ingenious schemes whereby promoters sought to obtain investment capital, the court held that the land sales contracts, warranty deeds and the service contracts which the defendants offered to prospective investors were, in this instance, "investment contracts." 328 U.S. at 300, 66 S.Ct. 1100. Moreover, the Court found the optional nature of the management contract or the existence of two promoters involved in the scheme to be irrelevant stating:

> This conclusion is unaffected by the fact that some purchasers chose not to accept the full offer of an investment contract by declining to enter into a service contract with the respondents. The Securities Act prohibits the offer as well as the sale of unregistered, non-exempt securities. Hence it is enough that the respondents merely offer the essential ingredients of an investment contract.

328 U.S. at 300–01, 66 S.Ct. at 1104.[2]

Applying the *Howey* principles in the instant case, it is evident that plaintiff was offered a pre-packaged investment contract consisting of both the evaluation contract and the marketing contract. In reaching that conclusion we are mindful of the Supreme Court's admonition that the court consider the economic realities of the transaction rather than its pure legal form, *e.g.*, *United Housing Foundation, Inc., supra*, 421 U.S. at 851–52, 95 S.Ct. 2051, and that the federal securities laws are to be construed "not technically and restrictively, but flexibly to effectuate [their] remedial purposes."

**2.** *Howey*, of course, involved the claim of the sale of an unregistered security, under section 5 of the 1933 Act, Section 2(3) of the 1933 Act defines "sale" to include every "attempt or offer to dispose of, or solicitation of an offer to buy" a security for value. Section 10(b) of the 1934 Act, the provision *sub judice*, on the other hand, prohibits fraudulent and manipulative devices in connection with the "purchase" or "sale" of a security. While the terms "purchase " and "sale" have been given a broad interpretation by the courts, it is, nevertheless, clear that to recover under § 10(b) and Rule 10b–5 the plaintiff must have either purchased or sold a security. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). In the instant order we reach only the narrow question of whether there was a security involved in the instant transaction to support a finding of federal subject matter jurisdiction, and not whether the plaintiff has stated a claim under Rule 10b–5. Arguably, plaintiff may have made allegations sufficient to state a claim under either § 5 of the 1933 Act or Rule 10b–5; however, plaintiff may wish to amend his complaint to more clearly reflect either theory of recovery.

*S.E.C. v. Capital Gains Research Bureau, Inc.* 375 U.S. 180, 195, 84 S.Ct. 275, 285, 11 L.Ed.2d 237 (1963). *See also, Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). Moreover, in determining the nature and character of the putative security instrument, it is proper to consider *"the terms of the offer,* the plan of distribution, and *the economic inducements held out to the prospect"* and further "it is not inappropriate that promoters' offerings be judged as being what they were represented to be." *S.E.C. v. C.*

*M. Joiner Leasing Corp.,* 320 U.S. 344, 352–53, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943) (emphasis supplied). In the instant action, contrary to defendants,' assertions, it is evident that defendants were not merely offering separate and divisible contracts for evaluation and marketing of an invention. On the contrary, the evaluation contract is somewhat meaningless and wholly unattractive to the potential investor unless it is considered in conjunction with the second contract whereby the defendant held out the prospect and promise of profits upon successful marketing and distribution if the initial evaluation proved to be favorable.[3]

**3.** Other indicia of the character of the promoter's offering and the nature of the scheme as a whole can be found in the fact that after investing the initial $250.00 and a positive evaluation by the Evaluation Committee, plaintiff received a certificate entitled "International Merit Award for Creative Thinking" which stated that the award was presented "in recognition of this achievement in creative thinking and merits International Inventors Incorporated offer of Representation and Registration." Moreover, the hyperbolic and glowing evaluation of the marketing outlook for plaintiff's "Lounge" further evidence the enticements that were held out to allure the investor/inventor to invest the additional $950.00 necessary to secure defendants marketing services. Several passages are illustrative:

CONCEPT APPEAL

The "LOUNGE" is an innovative idea which should receive an *enthusiastic welcome from millions of people all over the United States as well as in other industrialized countries of the world.* The realization of this unique and decorative invention would provide a piece of furniture which could be used in homes, offices, hospitals, nursing homes, and other such public and private establishments . . . It could be kept in a living room, den, patio, study, etc. It could also be used in executive offices or other places. The decorative and beautiful appearance of this invention would attract the attention of millions of people. It could be used very effectively for treatment and comfort of millions of patients who suffer from back problems . . . *This unique piece of furniture is expected to captivate the attention of one and all* . . . It should have tremendous selling appeal and a large number of sales in the commercial market . . .

PRODUCIBILITY

The producibility of "LOUNGE" should not encounter any difficulty whatsoever . . . All the new raw materials are easily and

readily available in abundance. There are 9,518 companies with 10,008 manufacturing establishments which are involved in the production of furniture and fixtures. Many of these manufacturers could produce this investment very efficiently and economically.

MARKET ANALYSIS

The market available for "LOUNGE" seems to be very large and continuously developing. It could become vast in proportions with the inclusion of foreign trade and exports. *According to available government statistics, there are 214,000,000 people living in more than 70,000,000 household units in the United States.* There are 87,000,000 hotels and motels, 7,100 hospitals, 16,700 nursing homes and 3.5 million miscellaneous business establishments in the United States. There are more than 8,000,000 boat owners and 14,000,000 campers in the United States. Moreover, "LOUNGE" could also be used in airplanes. It is estimated that there are 2,500 domestic and international aircraft in the United States alone . . . *In addition, it should also find a four to five times larger market available in the rest of the industrialized world. It is indicated from that fact that there are more than 800,000,000 people living in excess of 210,000,000 household units in other industrialized countries of the world.* Moreover, the consideration of extremely large and ever-expanding markets available in rapidly developing nations of Asia, Africa, and South America would tremendously add to the market potential of "LOUNGE." *The vastness of the available market should generate a very high volumes [sic] of sales in this invention. It should see a wide appeal in the world market.*

DISTRIBUTION/SALES

Primary distribution and sales challens for "LOUNGE" are extremely well established and large in number. These potential sales outlets could include 66,705 furniture and home furnishing stores, 7,742 department stores, etc. in the United States. . . .

In sum, the evaluation contract together with the marketing contract under these circumstances constitute an "investment contract" and, therefore, there is a "security" present for the purposes of jurisdiction under the federal securities laws.

Accordingly, defendants' motion for reconsideration of the portion of this court's order dealing with subject matter jurisdiction is hereby DENIED.

## PARTIAL SUMMARY JUDGMENT

Defendant International Inventors, Inc., East [hereinafter the "Virginia corporation"] has also moved for summary judgment, or more precisely for partial summary judgment on the plaintiff's common law fraud count. The gravamen of plaintiff's allegations in connection with this claim is that he was fraudulently induced into entering into the evaluation contract on the basis of representations that if his invention received a positive market evaluation and upon the payment of an additional fee, the Virginia corporation would use its best efforts to profitably market and/or license the invention. Plaintiff further contends that the Virginia defendant had neither the intention nor the capability of ever marketing the invention, that the so-called "Evaluation Report" contained meaningless and generalized data, and that the only motive of the defendant in making the contract was to extract $250.00 from unsuspecting investors.

The Virginia corporation has moved for partial summary judgment on several grounds not heretofore considered by this court. Although the evaluation contract contained language to the effect that the defendant only promised to perform evaluative services, and not to market the invention, plaintiff, nevertheless, when sending his initial check wrote that the purpose of the check was for "evaluation and marketing." While denying that there was any fraud in the transaction, the Virginia corporation argues that even assuming arguendo the existence of fraudulent misrepresentations, it cannot be held liable since (1) the Georgia company was merely an independent contractor and/or licensee with respect to the Virginia corporation and therefore not responsible for its misrepresentations, if any, or (2) the language in the contract itself states that defendant assumed no obligation beyond a thorough evaluation of the invention, and did not "guarantee that the invention will be produced or marketed."

 With respect to the former argument, the contract expressly states that the parties (the Virginia corporation and the Georgia company) intend to create the relationship of "independent contractor." Language to that effect in the contract is not determinative of the relationship between the parties. On the contrary, the chief test in determining whether an employee is an independent contractor lies in whether the contract gives or the employer assumes the right to control the time, manner, and method of executing the work as distinguished from the right merely to require certain definite results in conformity with the contract. Ga.Code Ann. § 105–502. *Jordan v. Townsend*, 128 Ga.App. 583, 584, 197 S.E.2d 482 (1974); *Hotel Storage, Inc. v. Fesler*, 120 Ga.App. 672, 674, 172 S.E.2d 174 (1969). Moreover, if the employer retained the right to control, it is immaterial whether the employer in practice exercised such authority. *Id.; Old Republic Insurance Co. v. Pruitt*, 95 Ga.App. 235, 97 S.E.2d 521 (1957). Although the contract on its face created an independent contractual relationship, there were no provisions prohibiting the Virginia corporation from exercising any control over its agent's work. In fact, the contract contained numerous provisions requiring the Georgia company to submit weekly lists of prospects and nu-

---

PROFIT POTENTIAL
 After consideration of proposed production costs and taking into account the usual mark-ups, the accompanying wholesale and retail prices of "LOUNGE" could be placed at $100.00 and $179.89, respectively. Based upon a *very conservative estimate, an annual sale of 50,000 units of this invention should generate tremendous profits for the manufacturer; and the inventor could also receive substantial sums in royalty returns . . .*
(Emphasis supplied).

merous other reports to the Virginia corporation, and it is evident that the Virginia corporation retained pervasive supervisory authority. Thus, it is apparent that the Virginia corporation retained the right to control its licensees in the field and it cannot be held as a matter of law that the Georgia company was an independent contractor.

Likewise, we find defendant's contentions that the Georgia company was a mere "licensee" equally unavailing. In *Arthur Murray, Inc. v. Smith*, 124 Ga.App. 51, 53, 183 S.E.2d 66 (1971), the Georgia Court of Appeals held that the mere payment of royalties by a franchisee or a licensee to the franchisor or licensor does not create an agency relationship. The court distinguished a licensing agreement from an agency agreement on the ground that the former does not contemplate a sharing of profits, since royalties are neither profits nor portions of profits. *Id.* The instant contract, however, contains numerous profit-sharing provisions with respect to both evaluative and any subsequent marketing services, as well as a division of all money to be received in the event the Virginia corporation could successfully enter into licensing agreements with manufacturers. In sum, the purported status of the parties herein does not absolve the Virginia corporation from any liability for the alleged fraudulent misrepresentations of the Georgia company.

 On the other hand, the evaluation contract executed by plaintiff inventor specifically states that the Virginia corporation is not obligated thereby to do anything more than evaluate the invention. Under Georgia law, to prove fraud, it is incumbent upon a plaintiff to prove: (1) the misrepresentation of a material fact (2) made wilfully to deceive with knowledge of its falsity, and (3) acted upon by the opposite party to his detriment. Ga.Code Ann. § 37–703. Moreover, in order to constitute fraud, the material misrepresentation must be as to a past or present fact, rather than a promise or representation as to future facts or events. *See, e.g., Musgrove v. Musgrove,* 213 Ga. 610, 100 S.E.2d 577 (1957); *Beach v. Fleming,* 214 Ga. 303, 104 S.E.2d 427 (1958). Similarly the aggrieved party must have had a right to rely upon the misrepresentation and actually have relied upon it. *E.g., Tison v. Eskew,* 114 Ga.App. 550, 151 S.E.2d 901 (1966); *Maxey-Bosshardt Lumber Co., Inc. v. Maxwell,* 127 Ga.App. 429, 431, 193 S.E.2d 885 (1972). It is well settled that one who has the capacity and opportunity to read a written contract, who signs it, not under any emergency, and whose signature was not obtained by any trick or artifice cannot afterwards sue for fraud in the inducement. *Compare Maxey-Bosshardt Lumber Co., Inc. v. Maxwell, supra, with Hester v. Wilson,* 117 Ga.App. 435, 160 S.E.2d 859 (1958).

 Applying these legal principles in the instant case it is apparent that entry of summary judgment in favor of the defendant Virginia corporation is warranted. In the first instance, any supposed misrepresentations as to marketing the invention were clearly predictions of future events and, therefore, not misrepresentations as to existing or past facts. Likewise, any reliance on these misrepresentations was unjustified and unreasonable as a matter of law in view of the express language of the evaluation contract, that defendant was not obligated thereby to market the invention. Finally, the alleged oral misrepresentations herein are not of the sort that would warrant setting aside the contract for fraud in the inducement since the alleged fraud is not of the nature that would vitiate the contract because the plaintiff was prevented from reading the contract. *E.g., Sloan v. Farmers, etc., Bank,* 20 Ga.App. 123, 92 S.E. 893 (1917); *Thomas v. Eason,* 208 Ga. 822(3), 69 S.E.2d 729 (1952).

In sum, this court has today (1) DENIED defendants' motion for reconsideration of that portion of the November 1976 order dealing with subject matter jurisdiction, and (2) GRANTED International Inventors, Inc.-East's motion for partial summary judgment on plaintiff's common law fraud claims.

IT IS SO ORDERED.