**MANAGEMENT ASSISTANCE, INC., A New York Corporation, Plaintiff,**

v.

**COMPUTER DIMENSIONS, INC., A Georgia Corporation, Defendant.**

**COMPUTER DIMENSIONS, INC., Plaintiff,**

v.

**BASIC FOUR CORPORATION, Sorbus, Inc., and Management Assistance, Inc., Defendants.**

Civ. A. Nos. C81–1300A, C81–1424A.

United States District Court,
N. D. Georgia,
Atlanta Division.

July 21, 1982.

Jerry B. Blackstock, Mark R. Swanson, Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., Gerald Walpin, Marvin R. Lange, Susan J. Schwartz, Rosenman, Colin, Freund, Lewis & Cohen, New York City, for Management Assistance Inc.

Robert D. Feagin, Katharine C. Robey, Gambrell & Mobley, Atlanta, Ga., for Computer Dimensions Inc.

## ORDER

SHOOB, District Judge.

These two actions arise out of the parties' contractual dealings over a period of approximately four years. Both cases are presently before the Court on (1) an amended motion for summary judgment by Management Assistance, Inc. (MAI), Basic Four Corporation (BFC) and Sorbus, Inc. (Sorbus), (2) Computer Dimensions, Inc.'s (CDI) motion to compel answers to certain of its interrogatories and to compel production of certain documents and (3) a motion for a protective order by MAI, BCF and Sorbus.

## FACTS

The Court finds the following facts to be relevant to the disposition of the pending motions and undisputed by the parties unless otherwise indicated. About May 1978 Mr. Carl Childre, a consultant and advisor to CDI [1] contacted BFC [2] on behalf of CDI. CDI asserts that from the outset it sought from BFC a multiple system discount contract, a contract for the sale of a number of computer systems at a discount, or a dealership agreement. Subsequently, the parties had numerous discussions regarding the sale of BFC computers to CDI. The record shows the following written agreements between the parties:

1. Purchase agreement dated September 28, 1978, through which CDI purchased from BFC a computer system, a Basic Four Model 610–B. MAI's Exhibit 2. This agreement was signed by CDI's president, Lauralee Childre, on September 28, 1978 and accepted by BFC, through Mr. J.F. Carse, BFC's manager of contracts administration, on November 14, 1978.

2. Purchase agreement dated November 27, 1978, through which CDI purchased from BFC certain add-on equipment to be used with the previously purchased computer system. MAI's Exhibit 7. This agreement was executed by Carl Childre on behalf of CDI, writing the name of Lauralee Childre, on November 27, 1978 and by Mr. Carse on June 8, 1979.

3. A letter agreement dated June 15, 1979, which according to MAI bars all of CDI's state law claims. MAI's Exhibit 19. This letter agreement was accepted by CDI through its president on July 3, 1979. The agreement provides as follows:

> This letter will confirm the understanding between BASIC FOUR CORPORATION (BFC) and COMPUTER DIMENSIONS, INC. (CDI).

1. CDI is a Georgia corporation with its principal place of business in Douglas County, Georgia. It assertedly is in the business of designing, manufacturing and marketing computer systems and related components.

2. BFC was at all relevant times a wholly owned subsidiary of Management Assistance, Inc., (MAI) in the business of supplying computer

In consideration of CDI's payment to BFC of an amount equal to Ten Thousand ($10,000.00) Dollars and release of BFC (which is hereby acknowledged) from every claim, liability or responsibility which BFC may have to CDI, whether or not now known, arising out of or incurred in connection with any act taken or omission made by CDI with respect to:

(a) CDI's Basic Four [R] Computer System and under the Agreement for Purchase of Basic Four Equipment dated Sept. 28, 1978 including any amendments thereto;

(b) any application software its quality, merchantability, installation, maintenance, operation or failure to operate, content or lack of content, which was installed on, or omitted to be installed on CDI's Basic Four Computer System;

(c) any responsibility for previously made commitments and/or agreements between BFC and CDI whether oral or written; and

(d) any contractual or other undertaking or duty which BFC had to CDI regardless of its nature;

BFC shall deliver to CDI the following equipment:

(a) 1350 Lightning Processor;

(b) 2581 DISC capacity upgrade 35 MB to 75 MB (2)

(c) 1307 Memory, 32 KB Module (one)

(d) Reconfiguration of BOSS Pack

(e) Further, BFC agrees to provide maintenance service on CDI's Basic Four Computer System through Sorbus Inc. (under the standard terms and conditions of a fully executed Sorbus Maintenance Agreement) for the current minimum monthly maintenance charge plus a surcharge of $300.00 per month for the peri-

systems hardware and software to distributors for sale. According to MAI, BFC at present is merely a division of MAI. Sorbus, Inc., also a party to this litigation, at all relevant times was a wholly owned subsidiary of MAI providing maintenance service to BFC computers. Sorbus, like BFC, is now a division of MAI according to the latter.

od of time CDI has ownership of BFC system.

As of October 21, 1981, the date of Mr. Childre's deposition, BFC had delivered to CDI all of the items enumerated in the June 15, 1979 agreement. Deposition of Carl Childre at p. 299. As of October 22, 1981, the date of Mrs. Childre's deposition, CDI had failed to pay BFC the $10,000.00 provided for in the said agreement. Deposition of Lauralee Childre at p. 207.

The record also shows the following unexecuted proposed agreements:

1. On September 18, 1978 CDI signed a volume discount purchase order which would have given CDI the option to acquire up to fifteen computer systems from BFC at an escalating discount. *Id.* at 10. The said purchase order shows on its face that it was never executed by BFC.[3]

2. On February 19, 1979 CDI signed a second volume discount purchase order which it submitted to BFC for approval. *Id.* at 16. This purchase order also on its face shows that it was never accepted by BFC.

No other written agreements were executed or exchanged by the parties. Carl Childre Deposition at pp. 252 & 292. On the other hand, CDI asserts that BFC made various representations to CDI before and at the time the agreement of June 15, 1979 was submitted to CDI which entitle it to relief against BFC in these actions. Specifically, CDI contends that the following events took place:

1. The September 18, 1978 volume discount purchase order was presented to BFC by Messrs. Yaeger and Stevens, respectively the manager of BFC's Atlanta office and a salesman at the said office, in September of 1978. Affidavit of Mr. Gary M. Stevens at ¶ 8. At that time Mr. Yaeger represented to CDI that the first system under the said volume purchase order would be installed by November 15, 1978. *Id.*

2. Even after Mr. Yaeger knew from BFC headquarters that the September 10, 1978 purchase order would not be accepted by BFC, Mr. Yaeger failed to communicate this to CDI officials or to Mr. Stevens. Affidavit of Carl Childre at ¶ 4 (hereinafter "Childre Affidavit"); Affidavit of Gary M. Stevens at ¶ 10. Instead, Mr. Yaeger told CDI officials that BFC would sell CDI an initial system at a 35% discount, a lower discount than that available through the September 10, 1978 purchase order, and that the volume discount purchase order would still be awarded. Childre Affidavit at ¶ 4.

3. In November of 1978, after CDI officials became acquainted with the BFC computer system in question, they were so dissatisfied with it that they requested Mr. Yaeger to stop delivery on the single unit which CDI had purchased at a 35% discount. *Id.* at ¶ 6. Another reason for CDI's request to stop delivery was that CDI had not yet received the promised volume discount purchase agreement. *Id.* Mr. Yaeger insisted that he would take care of all the problems and that the volume discount purchase order would in fact be approved by BFC; thus, he urged CDI to accept delivery of the unit covered by the purchase order dated September 28, 1978. Affidavit of Clifford W. Shealey at ¶ 5. *See* MAI's Exhibit 2. In December of 1978 BFC delivered the said unit to CDI. This purchase agreement provided that CDI and BFC entered into a software vendor concessionship. MAI's Exhibit 2.

4. At the request of BFC, in mid-March 1979, various officials of BFC and CDI met in Jacksonville, Florida. Affidavit of Dennis LaPidus at ¶ 9. The purpose of the meeting was to discuss various commitments made to CDI by Mr. Yaeger on behalf of BFC which had not been carried out. Affidavit of Alan M. Davis at ¶ 6. At that time, Mr. Davis, then Director of Marketing for BFC's then newly formed Distributive Data Processing (DDP) Division, "promised

---

**3.** CDI contends that there are issues of fact as to whether BFC executed this purchase order as well as the purchase order dated February 19, 1979. This claim is addressed infra at p. 676.

[CDI] that the volume discount contract (the OEM contract) [, a type of contract for the sale of a number of computer systems for eventual resale by the purchaser,] would be approved [by BFC] and handled through the DDP Division." *Id.;* Deposition of Lanny Kent at p. 62. At that time the parties also discussed how CDI's BFC computers would be serviced. Childre Affidavit at ¶ 8. Mr. Davis stated that the DDP Division had to work with Sorbus and that although the normal maintenance charge would be $600.00 per month, the DDP Division would charge only $300.00 to CDI and pay the difference to Sorbus. Childre Affidavit at ¶ 8.

5. After the Jacksonville meeting, Lanny Kent, a sales manager in the DDP Division, delivered to CDI a second purchase order for fifteen BFC–610 computer systems. *See* MAI's Exhibit 16. Mr. Kent characterized this order as an OEM contract. Kent Deposition at pp. 38–39. Concurrently, Mr. Kent received a deposit of $7,245.00 from CDI for the said purchase order and $58,-000.00 as payment for the first system delivered to CDI in December of 1978. *Id.* at p. 44. Mr. Kent assured CDI that this purchase order was then a "firm contract and that he [Mr. Childre] could now buy computer systems from [BFC] under ..." this agreement. *Id.* at p. 46. CDI would not have paid the $58,000.00 due on the first computer had it not been led to believe that it had obtained a contract for the purchase of an additional fifteen computers. *Id.* at p. 53.

6. On April 5, 1979, Mr. Davis returned to CDI the second purchase order for the fifteen 610 computers unexecuted by BFC together with CDI's check for $7,245.00 and a letter explaining the reasons for BFC's action. *See* MAI's Exhibit 17. This letter stated, inter alia, that

[t]he contract which I am returning will be superseded by one which will take into account all of the provisions we discussed. Lanny [Kent] will be submitting this contract for your review immediately upon its completion and review by Basic Four Corp. Corporate Marketing and Legal.

Later in April, Mr. Davis told Mr. Childre over the telephone that "the legal department at BFC would indeed approve P–16 (MAI's Exhibit 16) [this exhibit however is the one which had just been returned to CDI unexecuted] and that the contract was 'in the mail'." Childre Affidavit at ¶ 10.

7. During April of 1979, Mr. Davis however indicated to other BFC officers his view that BFC should not enter into an OEM contract with CDI. Davis Affidavit at ¶ 9. In early June, 1978, prior to June 18, Mr. Davis discussed the CDI account with David Seigle, who headed BFC's DDP Division. *Id.* at ¶ 10. Mr. Seigle then agreed with Mr. Davis "that BFC would probably be better off not to go through with the OEM deal" with CDI. *Id.* Mr. Seigle, according to Mr. Davis, had the authority to grant such a contract to CDI. *Id.* at ¶ 11.

8. On June 18, 1979, representatives from BFC and CDI met in Atlanta to discuss the maintenance agreements, the OEM contract problem and other difficulties between the parties. Childre Affidavit at ¶ 11. This meeting is best summarized by the testimony of Dennis LaPidus, one of BFC's representatives present at the meeting:

On or about June 18, 1979, Dave Seigle told Carl Childre that he had the authority to enter into a multiple discount contract on behalf of BFC, that CDI's contract was presently in the final stages of approval, and that the only remaining step was for CDI to sign a certain letter agreement. Dave Seigle then presented the letter to Carl Childre. I saw the letter agreement being presented at the meeting and am familiar with its contents. A true and correct copy of the letter is attached hereto as Exhibit A. Dave Seigle stated to the effect that once the agreement was signed, CDI could start selling computer hardware right away. I am personally aware that the parties present at the meeting agreed that the letter was not intended to involve any claims by CDI involving BFC's commitment to award CDI a volume discount contract. The letter agreement

was intended to cover only the events involved with the earlier sales by the Atlanta branch of BFC to CDI of a single computer system. I specifically recall that BFC agreed that CDI was supposed to receive all of the equipment described in the attached letter and the maintenance service specified therein *before* having to pay any part of the $10,000.00 to BFC.

(Emphasis in original.) LaPidus Affidavit at ¶ 10.

9. Mr. Seigle signed and initialed the letter agreement on June 18, 1979 and gave it to Mr. Childre for CDI's approval. *See* MAI's Exhibit 19. As noted above, CDI's president signed the letter on July 3, 1979.

10. In November of 1979 BFC delivered to CDI the 1350 lightning processor, the 2581 DISC and the 1307 memory. Childre Affidavit at ¶ 14. In February of 1980 BFC delivered to CDI a reconfigured BOSS pack, but Sorbus declared it nonfunctional. *Id.* at 16. Finally, in February of 1981 BFC delivered to CDI an operative BOSS pack. *Id.* at ¶. Only from this time on was CDI able to use the previously unpacked equipment delivered in November 1979. *Id.* at ¶¶ 16 & 17.

## MAI'S MOTION FOR SUMMARY JUDGMENT

### 1. *Standard for Summary Judgment*

Rule 56(c), Fed. R. Civ. P., provides that summary judgment "shall be rendered forthwith if ... [the record] ... show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party must show his entitlement to judgment with such clarity that the non-moving party cannot recover (or establish its defense under any discernible circumstance). *Everhart v. Drake Management, Inc.*, 627 F.2d 686, 690 (5th Cir. 1980). Furthermore, summary judgment is inappropriate even when there are no disputes as to material facts, if there remain factual inferences in dispute. *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 871 (5th Cir. 1978);

*Benton-Volvo-Metairie, Inc. v. Volvo Southwest, Inc. et al.*, 479 F.2d 135 (5th Cir. 1973). On the other hand, the non-moving party cannot avoid summary judgment without setting forth specific facts, via affidavits or other admissible evidence, showing material issues left for trial, "or at the very least stating reasons why he cannot do so." *Gossett, supra*, at 872; *Joe Regueira, Inc. v. American Distilling Co., Inc.*, 642 F.2d 826, 829 (5th Cir. 1981). For purposes of MAI's motion for summary judgment the Court will assume, as it must, the facts as presented by CDI and all inferences from those facts will be construed in its favor.

### 2. *The Merits*

#### A. State Law Claims

Movant contends that the June 15, 1979 letter agreement bars all of CDI's state law claims. CDI counters that issues of fact exist as to (1) whether the execution of the letter agreement was induced by fraud, (2) whether MAI complied with the terms of the said agreement, (3) whether a dealership agreement or a volume discount purchase agreement was reached by the parties, (4) whether MAI has defrauded CDI, (5) whether CDI can succeed on its claim of promissory estoppel; (6) whether MAI has breached its duty of good faith toward CDI, and (7) whether MAI is entitled to litigation expenses. These contentions will be addressed seriatim.

#### (i) Alleged Fraud in the Inducement

The elements to establish a claim of fraud can be stated as: (1) a misrepresentation by defendant of a material existing fact, (2) with knowledge that it was false or with reckless disregard as to whether it was true, (3) with intent to deceive plaintiff, and (4) plaintiff acted upon the misrepresentation in reasonable reliance upon its veracity in a manner which caused proximate injury. *Brown et al. v. Techdata Corp., Inc. et al.*, 238 Ga. 622, 625, 234 S.E.2d 787 (1977). Furthermore, a party with the capacity and opportunity to read a written contract, who executes it, not under any emergency, and whose signature was

not obtained by trick or artifice cannot later claim fraud in the inducement. *Jones v. International Investors Inc. East,* 429 F.Supp. 119, 129 (N.D. Ga. 1976).

. Movant argues that CDI's claim of fraud in the inducement is barred by the above principles and specifically that *Invest Air, Inc. v. Swearingen Aviation Corp.,* No. C77–1841A, slip op. (N.D. Ga. Apr. 11, 1979) controls this claim. In *Invest Air* plaintiff distributor sought rescission of a written nonexclusive distributorship agreement for a term of one year and a related aircraft purchase agreement. It argued that defendant fraudulently induced plaintiff to enter into the said agreements by oral assurances that the distributorship would be exclusive and for a period of three years. *Id.* at p. 6. The court ruled that

> [i]nsofar as the written instrument deals with a specific subject, the solemnity of the writing is protected by the parol evidence rule. [Citation omitted.] This well established principle should not be circumvented merely by seeking relief in the form of rescission based on a claim of fraudulent inducement.

Moreover, even if the parol evidence rule did not act to bar admission of statements which directly contradict the terms of the written terms of the contract, this Court would have to find that the plaintiff did not reasonably rely upon the defendant's prior oral assurances. Absent this element, fraud, in the legal sense, cannot exist. Ordinarily, the question of whether reliance was reasonable is left for determination by the jury. *Elliott v. Marshall,* 179 Ga. 639 [176 S.E. 770] (1934). However, Georgia courts have consistently held that in plain and undisputable cases, a determination by way of summary judgment is proper. See, *e.g., Worth v. Orkin Exterminating Company, Inc.* [142 Ga.App. 59, 234 S.E.2d 802], *supra.*

One cannot close his eyes and blindly rely upon the assurances of another absent some fiduciary relationship or emergency. Everyone must make use of his own facilities to avoid being defrauded. *B.E. Robuck, Inc. v. Walker,* 212 Ga. 621

[94 S.E.2d 696] (1956); *Feingold v. McDonald Mtg. & Realty Co.,* 166 Ga. 838 [145 S.E. 90] (1928). Specifically, everyone is charged with the responsibility of reading and knowing the contents of a contract which he signs. *Bradley v. Swift & Co.,* 93 Ga.App. 842 [93 S.E.2d 364] (1956). In the case at bar, the evidence produced through the depositions of Williams and Gamber clearly establishes that both read the written agreement and understood that it contained terms materially different from the purported oral assurances. In such a situation, any continued reliance on the purported oral assurances was clearly unreasonable. This Court can find no cases in which a plaintiff who had read and agreed to a written contract was allowed to rescind that contract based on the argument that he was induced to sign by promises even though those promises were specifically altered in the subsequent written contract. However, even in cases where the terms of a contract are misrepresented to one who does not read them, the Georgia courts have consistently held that reliance on the misstated contents of the contract was not justified since the plaintiff should have read the contract himself. See, *e.g., Ramada Inns, Inc. v. Chandler, supra; Granite Management Services, Inc. v. Usry,* 130 Ga.App. 667 [204 S.E.2d 362] (1974); *Bradley v. Swift & Co.,* 93 Ga.App. 842 [93 S.E.2d 364] (1956). The plaintiff in this action can be in no better a position merely because Williams and Gamber read the contract but chose to ignore its contents and rely on earlier promises.

*Id.* at pp. 10 & 11.

■ CDI asserts that *Invest Air* is distinguishable on various grounds. First, it argues that CDI, unlike plaintiff in that case, is not seeking to rescind any contracts but that it is (1) seeking money damages for fraud and (2) asserting that the letter agreement is voidable because, inter alia, it was induced by fraud. Apparently CDI's counsel failed to notice the following language in *Invest Air:* "[P]laintiff seeks to

recover for damages suffered by [its] reliance on the alleged fraudulent inducement and ... [plaintiff] argues that the defendant committed a fraud sufficient to render the written [agreements] voidable.... The plaintiff has established no basis for rescission ... nor has it shown any grounds for the recovery of tortious damages." *Id.* at pp. 1, 7, & 12. These statements satisfy the Court that the asserted first distinction between these actions and *Invest Air,* if any, is of no significance to the motion at hand.

Second, CDI advances that the written agreements executed in *Invest Air* were clear on their face whereas the letter agreement here is ambiguous and does not deal with claims relating to a dealership or OEM contract.[4] The letter agreement provides in pertinent part that upon certain conditions CDI releases BFC from any "liability or responsibility which BFC may have to CDI ... with respect to: ... (c) ... previously made commitments and/or agreements between BFC and CDI whether oral or written; and (d) *any* contractual or other undertaking or duty which BFC had to CDI *regardless of its nature...*" (Emphasis added.) MAI's Exhibit 19. *See* supra at pp. 2 & 3.

According to CDI, the above language does not encompass the volume discount contract (OEM, DDP, dealership) promised at various stages by BFC. It argues that the agreement's failure to mention any of these contracts in contrast to its specific reference to the original computer system and related application software is indicative of the former's exclusion. CDI also maintains that the above quoted language, although admittedly broad in scope, does not cover the OEM contract promised by BFC to CDI at the June 18, 1979 meeting. Since the agreement releases BFC, if at all,

only for "previously made *commitments*" and "any contractual duty ... which BFC had to CDI ..." it fails to include commitments made concurrently with its execution.

The Court finds the authorities cited by CDI in support of the proposition that the letter agreement is ambiguous distinguishable from the cases at bar. *See Creamer v. Smith,* 161 Ga.App. 312, 287 S.E.2d 755 (1982); *Knight v. Munday,* 152 Ga.App. 406, 263 S.E.2d 188 (1979); *Brown v. Brigham,* 143 Ga.App. 178, 237 S.E.2d 675 (1977). In *Creamer* the court held that a release "... for damages for car accident..." was ambiguous in a case where there were both property and personal damages at issue. 161 Ga.App. at 313, 287 S.E.2d 755. In *Knight* the court ruled that where a warranty deed showed a consideration of " 'Ten dollars and other valuable considerations' ... the deed on its face [did] not show itself to be complete, certain and unambiguous. [Citations omitted.] Thus parol evidence [was] admissible to show the actual consideration for the deed." 152 Ga.App. at 407, 263 S.E.2d 188. Finally, in *Brown* the court found that an agreement for the sale of the stock of a corporation which provided for the buyer to " 'maintain its present office and to employ Mrs. Waters until December 31, 1976...' " was ambiguous. 143 Ga.App. at 178, 237 S.E.2d 675. The court felt that it was "not clear whether the central concern of the disputed portion was provision of an office for appellee's use or retention of appellee's long-time employee." *Id.*

The Court finds the language in question to be unambiguous and therefore to exclude parol evidence "to add to, take from, or vary [the] written contract." Ga. Code Ann. § 20–704(1). Here, the language, although not specifically naming the volume

---

4. Whether the terms of an agreement are clear or ambiguous is a question of law for the Court. *Freeman v. Continental Gin Co.,* 381 F.2d 459 (5th Cir. 1967); *Honea v. Gilbert,* 236 Ga. 218, 219, 223 S.E.2d 115; Ga. Code Ann. § 20–701. Only if an ambiguity remains after the Court applies the appropriate rules of construction does the parties' intent become a question for the trier of fact after hearing all relevant evidence including parol evidence; *Brown v. Brigham,* 143 Ga.App. 178, 237 S.E.2d 675 (1977); *R.S. Helms, Inc. v. GST Development Co.,* 135 Ga.App. 845, 219 S.E.2d 458 (1975). *See generally* 3 *Corbin on Contracts 8* 554, at 219–25.

discount purchase agreement, on its face releases BFC from "any contractual or other undertaking or duty which BFC had to CDI regardless of its nature..." MAI's Exhibit 19. This language could not be more comprehensive and is clearly distinguishable from that found in the cases cited by CDI.

In *Creamer, supra,* the release dealt only with "damages". Furthermore, the following statement in that case is significant. "Had the endorsement been in settlement of all claims for the accident we would reach a contrary conclusion." *Knight* is wholly inapposite to the agreement at hand given that the disputed language was contained in a warranty deed for the sale of real estate. The rules of construction applicable to deeds to lands are unique and irrelevant to the parties' agreement here.[5] Lastly, the Court concludes that *Brown, supra,* does not support the proposition that this agreement is ambiguous.

The Court also finds CDI's argument that the letter agreement does not affect the OEM contract promised by BFC to CDI on June 18, 1979 unpersuasive. According to CDI, since the release by its express language is effective only "for previously made commitments" and for "any contractual duty... which BFC had to CDI..." it cannot cover promises made at the June 18, 1979 meeting.[6] The linchpin of CDI's argument is that the letter agreement was executed on June 18, 1979. However, CDI's president signed the agreement on July 3, 1979, not on June 18, 1979.

■ "[A] contract is binding upon the parties at the time it is executed." *Jones v. Jones,* 231 Ga. 145, 148, 200 S.E.2d 725 (1973). "[T]he writing, in order to evidence mutuality and consequently to be binding, must be 'signed by the party sought to be charged therewith' ... [citation omitted] ... and must also be signed or otherwise accepted by the opposite party." *Aspironal Laboratories, Inc. v. Rosenblatt,* 34 Ga.App. 255, 129 S.E. 140 (1925); *accord, Cochran et al. v. Eason et al.,* 227 Ga. 316, 318, 180 S.E.2d 702 (1971).

In this instance, CDI does not allege that it accepted the letter agreement prior to July 3, 1979, when its president signed it. Therefore, the Court concludes that the letter agreement was binding upon the parties on July 3, 1979. Accordingly, any promises or commitments made by BFC to CDI on June 18, 1979 are within the parameters of the release.

■ CDI also asserts that the release is ambiguous because it fails to state "upon what conditions and at what time, if any, the $10,000.00 was to be paid to [BFC]." CDI's Supplementary Memorandum at p. 4. When a contract fails to indicate a time within which it is to be performed, a reasonable time will be implied. *Griffith v. Federal Deposit Insurance Corp.,* 242 Ga. 367, 368, 249 S.E.2d 54 (1978). Accordingly, the parties' failure to indicate a time for their respective duties does not render the contract ambiguous. Additionally, the agreement does specifically enumerate the conditions which BFC would have to satisfy in order to be entitled to the release and the $10,000.00 in question.

Moreover, there is ample authority, aside from *Invest Air,* for the proposition that the agreement in question bars CDI's claim of fraud. In *Jones v. International Inventors Inc. East,* 429 F.Supp. 119, 129–130 (N.D. Ga. 1976) plaintiff asserted that he was fraudulently induced to enter into a written evaluation contract[7] by defendant's representations "that if his invention received a positive market evaluation and

5. Ga. Code Ann. § 29–101 provides as follows: A deed to lands must be in writing, signed by the maker, attested by at least two witnesses, and delivered to the purchaser, or someone for him, and be made on a valuable or good consideration. The consideration of a deed may always be inquired into when the principles of justice require it.

6. At this meeting, as noted supra at p. 671, a BFC official signed the said letter on behalf of BFC and presented it to CDI for its approval.

7. The contract provided that defendant, in exchange for plaintiff's payment of a fee, would evaluate his invention for possible marketing. *Id.* at 130.

upon the payment of an additional fee, [defendant] would use its best efforts to profitably market and/or license the invention." *Id.* at 129. Plaintiff argued, inter alia, that defendant had neither the intention nor the capability of ever marketing the invention and that defendant's only motive was to defraud unsuspecting investors. *Id.* The Court granted defendant's motion for summary judgment on plaintiff's fraud claim on the following three grounds, which this Court finds entirely applicable to the cases at bar: (1) any misrepresentations as to the marketing of the invention were predictions of future events, (2) any reliance on these misrepresentations was unreasonable as a matter of law given the contract's express language that defendant was not required to market the invention and (3) plaintiff's claim of fraud in the inducement was meritless since plaintiff was not prevented from reading the contract. *Id.* at 130.

Similarly, in *Ramada Inn, Inc. v. Chandler,* No. 70–604A, slip op. (N.D. Ga. May 13, 1977) this Court granted plaintiff's motion to strike defendants' counterclaim for fraud in the inducement of certain licensing agreements and several contracts executed pursuant thereto. The Court ruled that "since it is undisputed that defendants could read and that they instead chose to rely upon the oral representations of plaintiff's agents concerning the contents of the subject contract, . . . they may not now sustain a claim for fraud in the inducement with respect to those contracts." *Id.* at p. 4.

Here, as in *Invest Air, International Investors,* and *Ramada Inn,* the claim of fraud in the inducement cannot survive movant's motion for summary judgment.[8] First, for the reasons noted above, the agreement in question is unambiguous. Second, BFC's alleged misrepresentations that upon CDI's signing the release BFC would award it the volume discount purchase agreement concerned future events. Third, the record

shows that CDI had ample opportunity to read and reflect upon the contents and legal significance of the release agreement. Fourth, as further elaborated below, the Court finds that CDI's reliance on MAI's representations was unreasonable as a matter of law.

CDI could not "close its eyes and blindly rely upon the [oral] assurances of [BFC]" that upon CDI's signing the letter agreement it would become an OEM dealer and could immediately start selling BFC systems when the written agreement contained no language to that effect. *Invest Air, supra,* at p. 10. To the contrary, the terms of the agreement negate any such understanding between the parties.

Furthermore, given the prior dealings between the parties, CDI's reliance on these alleged oral representations seems utterly unreasonable. After all, the purchase agreement delivered to CDI by Lanny Kent of BFC after the Jacksonville meeting was characterized by Mr. Kent as a "firm contract", only to have another BFC official, Al Davis, in April of 1979 return the said agreement to CDI unexecuted. Kent Deposition at p. 46. Later, when Mr. Childre called BFC to inquire as to the reason for the return of this agreement, allegedly, he was told that the OEM contract was "in the mail." Thus, when on June 18, 1979 BFC officials once again told CDI that upon signing the letter agreement the OEM contract was to be effective or forthcoming, it was unreasonable for CDI to rely on those words versus the written agreement.

Accordingly, MAI's motion for summary judgment on CDI's claim of fraud in the inducement is hereby GRANTED.

(ii) Alleged Failure of BFC to Comply with the Letter Agreement

CDI contends (1) that sales law is inapplicable to the letter agreement[9] and (2) that

---

8. The Court's finding is also supported by the following decisions. *Mitchell v. Excelsior Sales & Imports, Inc.,* 243 Ga. 813, 815, 256 S.E.2d 785 (1979); *C.P.D. Chemical Company, Inc. v. National Car Rental Systems, Inc.,* 148 Ga.App. 756, 758–59, 252 S.E.2d 665 (1979).

9. This argument is somewhat inconsistent with CDI's position elsewhere that the UCC is applicable. In arguing that its claim for bad faith is viable, CDI relies in part on section 1–203 of Georgia's UCC.

the extreme tardiness on the part of MAI to deliver the equipment specified in the agreement caused a failure of consideration which renders that agreement inoperative. CDI also asserts MAI's tardiness as a defense to MAI's claim for the unpaid $10,-000.00. These arguments are addressed after a brief synopsis of the pertinent authorities.

Georgia's Uniform Commercial Code (UCC) "applies to transactions in goods..." Ga. Code Ann. § 109A–2–102. This provision was interpreted in *Key v. Bagen et al.,* 136 Ga.App. 373, 221 S.E.2d 234 (1975) where the court held that a transaction for the sale "of a horse, apparently for recreational use, while possibly a casual sale, nevertheless, is provided for in [Georgia's UCC] which applies to transactions in goods." (Citation omitted.) Section 2–607(1) of Georgia's UCC provides that "[t]he buyer must pay at the contract rate for any goods accepted" and section 2–606(1)(c) states that "[a]cceptance of goods occurs when the buyer does any act inconsistent with the seller's ownership..."

In *United States v. Crawford,* 443 F.2d 611 (5th Cir. 1971) plaintiff filed suit to recover $6,298.50 that remained unpaid on the sale of eighteen fuel filter/separator units. *Id.* at 612. Defendants admitted that $6,298.50 remained unpaid but argued that they were excused from further payment by certain deficiencies in plaintiff's performance on the contract. *Id.* at 613. It was undisputed that plaintiff furnished the goods and that defendant received and installed all eighteen units. *Id.* The court ruled that once defendant accepted the goods and installed the units, any subsequent attempt at revocation was ineffective. *Id.* Thus, defendants were liable to plaintiff for the unpaid balance on the contract. *Id.* at 616.

■ Here, the Court finds that Georgia's UCC governs the parties' letter agreement. Undoubtedly, the said agreement operates to release BFC from various claims that CDI might otherwise have against it. However, it is also beyond dispute that the agreement involves, at least in part, a "transaction in goods". The agreement provides for BFC to supply certain goods to CDI in exchange for $10,000.00 and a release of various claims. In the Court's view this situation presents a significantly more convincing case for the operation of the UCC than that found in *Key, supra,* (casual sale of horse for recreational use).

■ Second, the Court concludes that *Crawford, supra,* compels a finding that CDI cannot assert BFC's tardiness as a ground to avoid the parties' agreement. As in *Crawford,* the record shows: (1) that BFC delivered the goods in question; (2) that CDI received and installed the goods. Childre Affidavit at ¶ 17. Thus, any subsequent attempt by CDI to revoke the contract or to avoid payment of the $10,000.00 is ineffective.

Therefore, MAI's motion for summary judgment on its claim for the $10,000.00 provided for in the letter agreement is hereby GRANTED. MAI is also GRANTED a judgment of foreclosure of the security interest it retained through the purchase order executed by the parties pursuant to the letter agreement. MAI's Exhibit 21.

(iii) Whether a Dealership Agreement or a Volume Discount Purchase Agreement was Reached by the Parties

CDI maintains that issues of fact exist as to whether both volume discount purchase orders (MAI's Exhibits 10 & 16) are binding on BFC because each was signed by an agent of BFC. These two purchase orders were signed by BFC officials prior to the execution of the June 15, 1979 letter agreement. Thus, even if we were to assume that they are binding contracts, the letter agreement releases BFC of any liability for these purchase orders.

Accordingly, MAI's motion for summary judgment on CDI's contract claims is hereby GRANTED.

(iv) CDI's Claims for Fraud, Promissory Estoppel and Bad Faith

The Court finds CDI's claims of fraud, promissory estoppel and bad faith to be

without merit. CDI argues that MAI's on-going promises to CDI, that it would deliver the volume discount purchase agreement, entitle it to recovery under the aforesaid theories. According to CDI, "the single factor which separates this case from all others is the element of detrimental reliance." CDI's Supplementary Memorandum at p. 17. CDI asserts that it would never have bought, or otherwise it would have returned, the initial system that it purchased from BFC, had it not been assured that it could buy and sell additional systems to its customers.

■ First, in order to prevail on its fraud and promissory estoppel claims CDI has to prove reasonable detrimental reliance upon the asserted promises by BFC officials. If CDI shows reasonable detrimental reliance, which the court assumes for purposes of this motion, its remedy consists of the right to enforce that promise as a binding contract against BFC. *See, e.g., Pethel v. Waters,* 220 Ga. 543, 552, 140 S.E.2d 252 (1965) (where party making an invalid agreement or promise induces another to forego a valuable legal right, he is estopped to deny the right of the promisee to have the agreement carried out or the promise fulfilled). However, by executing the letter agreement CDI released BFI for any "previously made commitments... whether oral or written". Thus, CDI's fraud and promissory estoppel claims fail because by showing reasonable detrimental reliance its remedy is enforcement of the promises which in turn are barred by the subsequently entered release.

■ CDI also raises a claim against BFC for its alleged failure to deal with it in good faith as required by Georgia law. Section 1–203 of Georgia's UCC (Ga. Code Ann. § 109A–1–203) provides that "[e]very contract or duty within this title imposes an obligation of good faith in its performance or enforcement." There is no reported decision in this state discussing whether this provision by itself provides the basis for an independent cause of action. However, in *Chandler v. Hunter,* 340 So.2d 818, 821 (Ala. Civ. App. 1976) the court addressed this issue and ruled as follows:

Failure to act in good faith in the performance or enforcement of contracts or duties under [Alabama's UCC] does not state a claim for which relief may be granted in Alabama. *Nor have we been able to discover a jurisdiction which allows recovery of damages under this general provision of the Uniform Commercial Code.* There is no indication, either in the text or the comments, that section 1–203 [section 1–203 of the Alabama UCC is identical to Georgia's section 1–203] was intended to be remedial rather than directive.

(Emphasis added.) The Court finds the holding and reasoning of *Chandler* persuasive and believes that the Georgia courts, if confronted with this issue, would give section 1–203 the same construction. Therefore, the Court holds that CDI cannot assert as an independent claim BFC's alleged failure to deal in good faith.

For the foregoing reasons, MAI's motion for summary judgment on CDI's claims of fraud, promissory estoppel and failure to deal in good faith is hereby GRANTED.

(v) BFC's Counterclaim for Costs of Litigation Including Attorney's Fees

■ BFC asserts that Ga. Code Ann. § 20–1404 authorizes this Court to grant its request for expenses of litigation. Section 20–1404 provides in pertinent part that "if the defendant has acted in bad faith, or has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, *the jury may allow* [expenses of litigation] ..." (Emphasis added.) That provision makes clear that the question whether a party is entitled to expenses of litigation is one left to the jury. *See, e.g., Third World, Ltd. No. II, Inc. et al. v. Brewmasters of Augusta, Inc. et al.,* 155 Ga.App. 352, 354, 270 S.E.2d 891 (1980). Furthermore, the Court finds those cases cited by BFC, such as *Brannon Enterprises, Inc. v. Deaton,* 159 Ga.App. 684, 285 S.E.2d 27 (1981), in support of the proposition that this Court can make an award of litigation expenses herein inapposite to the cases at bar.

Therefore, MAI's motion for summary judgment on its counterclaim for litigation expenses is hereby DENIED.

## B. Antitrust Claims

█ CDI asserts the following antitrust claims: (1) price fixing; (2) division of markets and allocation of territories; (3) attempt to monopolize and monopolization of market in "information packages"; [10] (4) price discrimination; and (5) tying arrangements. MAI, on the other hand, counters that CDI's antitrust allegations are mere conclusory statements with no support in the record.

The Court has carefully reviewed the aforementioned claims and has serious doubts as to their merit. Nevertheless, given that a number of pertinent interrogatories and requests for production of CDI remain unanswered, the Court concludes that the present record is insufficient to determine adequately MAI's entitlement to summary judgment on these claims. Accordingly, the Court DEFERS ruling on CDI's antitrust claims.

## CDI'S MOTIONS TO COMPEL ANSWERS TO INTERROGATORIES AND TO COMPEL PRODUCTION OF DOCUMENTS

█ The Court finds the following interrogatories and requests for production of documents of CDI relevant to its antitrust claims: Interrogatories numbers 4, 21, 22, 27, 31, 33 and 34; requests for production of documents numbers 8, 9, 12 and 14. Nevertheless, MAI objects to these interrogatories and requests on the ground, inter alia, that they call for confidential, commercial and trade secret information. Thus, MAI is ORDERED to file, within thirty (30) days of this date, all documents covered by the above requests and interrogatories that it claims contain confidential, commercial and trade secret information with the Court for its *in camera* inspection.

Shortly after these documents have been filed the Court will issue an order ruling on CDI's motions to compel and MAI's motion for a protective order with respect to these documents. Accordingly, with the exception of those documents which shall be filed for *in camera* review, CDI's motion to compel answers to interrogatories numbers 4, 21, 22, 27, 31, 33 and 34 and its motion to compel production of documents numbers 8, 9, 12 and 14 is hereby GRANTED. MAI is ORDERED to tender these documents to CDI within thirty (30) days of this date. Also, MAI's motion for a protective order, except with respect to the documents to be filed for *in camera* review, is hereby DENIED.

## SUMMARY

MAI's motion for summary judgment on CDI's state law claims is GRANTED. MAI's motion for summary judgment on its claim for $10,000 is GRANTED. MAI is also GRANTED a judgment of foreclosure of the security interest it retained in the purchase order dated June 18, 1979. MAI's motion for summary judgment on its counterclaim for litigation expenses is DENIED. The Court DEFERS ruling on MAI's motion for summary judgment on CDI's antitrust claims. CDI's motions to compel answers to interrogatories and to compel production of documents is GRANTED, with the exception of those documents which MAI claims contain confidential, commercial and trade secret information. The Court DEFERS ruling on CDI's motions to compel answers to interrogatories and to compel production of documents, as well as MAI's motion for a protective order, as to those documents which MAI asserts contain confidential, commercial and trade secret information; as to others, MAI's motion for a protective order is DENIED. MAI is ORDERED to file the above mentioned documents with the Court for its *in camera*

---

**10.** CDI defines "information packages" as combinations of computer hardware and software specifically designed for and particularly useful in the hospital administration and apparel manufacturing businesses. CDI's Complaint in

C81–1424A at ¶ 11. CDI alleges that BFC manufactures these "information packages" and that CDI wished to purchase these packages from BFC for resale to CDI's customers.

review within thirty (30) days of this date. MAI is ORDERED to tender to CDI the documents not to be filed with the Court within thirty (30) days of this date.