**WESTINGHOUSE CREDIT CORPORATION,**
Plaintiff,

v.

**William J. HALL, Harry Howard, Troy Bouy and Bernard E. Hirsch, Jointly and Severally, Defendants.**

No. CV491–112.

United States District Court,
S.D. Georgia,
Savannah Division.

Aug. 18, 1992.

Mark L. Jenkins, Savannah, Ga., for plaintiff.

Fred S. Clark, Savannah, Ga., for defendant Hall.

Alex Zipperer, Savannah, Ga., for defendants Howard, Bouy and Hirsch.

## ORDER AND MEMORANDUM

NANGLE, District Judge, sitting by designation.

Plaintiff Westinghouse Credit Corporation ("WCC") filed this instant diversity action in an effort to enforce a personal guaranty agreement. Presently before the Court is WCC's motion for summary judgment against defendants, alleging payment due as a matter of law. Defendants counter the motion with four arguments. First, defendants contend that the guaranty agreement entered between them and WCC was novated due to an action taken by plaintiff during bankruptcy proceedings. Alternatively, defendants accuse plaintiff of pursuing this lawsuit in bad faith, contrary to Georgia law. In concert with the bad faith claim, defendants propose that plaintiff's lawsuit was brought without substantial justification, thereby warranting a claim for malicious use of process against plaintiff. Finally, defendants al-

lege that, as a result of this entire legal process, they suffered from emotional distress. Below, the Court will consider each of these allegations, concluding in the end that the motion for summary judgment should be granted.

## FACTS

Bouy, Hall & Howard and Associates is a Georgia partnership which currently operates a Quality Inn Motel near the airport in Savannah, Georgia. The Quality Inn, which is the partnership's primary asset, currently has two security interests in it. The holder of the first security deed, Lincoln National Life Insurance Company, is not presently involved in this suit. It is WCC, the holder of the second security deed, that initiated the present litigation.

On July 31, 1986, the partnership executed a promissory note payable to plaintiff in the principal amount of 1.6 million dollars. The loan was secured by a lien on the partnership's interest in the Quality Inn. In addition, in order to induce plaintiff to make the loan, defendant partners Hall, Howard, Hirsch and Bouy each personally and unconditionally guaranteed payment of the note.

On December 5, 1989, the partnership filed a voluntary petition under Chapter 11 of the Bankruptcy Code for a reorganization. On June 18, 1990, the Bankruptcy Court entered a consent order delineating the use of the Quality Inn's cash collateral while the partnership is in bankruptcy. This order was, in effect, a culmination of an agreement among all of the parties in bankruptcy which was signed by plaintiff as well as each of the defendants on behalf of the partnership.

The promissory note became due and payable in full on August 1, 1990. Although the note provided for the exercise of an option to extend the term of the note for one year, upon the payment of a $16,000 fee, no such extension was entered under the terms of the agreement. Instead, payments have been made regularly under the cash collateral agreement since entry of the order on June 18, 1990. By participating in the agreement, the partner-

ship was required to pay a sum constituting more than the normal monthly payments due under the note, in an effort to keep payments current and make up for some of the lost payments. Defendants' efforts appear to have been to no avail, however, since the partnership still owed plaintiff $1,584,846 as of the date of filing suit, April 28, 1991. Moreover, to date, the partnership is still in bankruptcy.

Because the partnership failed to make the appropriate payments under the note, failed to pay off the note when it matured and filed a petition in bankruptcy, all in violation of the default provisions in the note, plaintiff, consequently, brought this suit to recover under the guaranty. It seeks the entire amount due under the note, as well as accrued interest and attorneys' fees, as prescribed by the guaranty language.

Defendants argue that they are not responsible under the guaranty for a variety of reasons. Primarily, they argue that the cash collateral agreement operated as an extension or novation of the original note, thereby relinquishing them from liability. Defendants also argue that the bankruptcy proceedings, coupled with the financial jeopardy they suffered as a result of paying more under the cash collateral agreement than what the partnership was earning, relieved them from any responsibility.

Defendants' second and third arguments focus on plaintiff's reasons for bringing suit. Initially, defendants surmise that plaintiff should not be able to recover because it violated its obligation of dealing in good faith. This necessarily ties into defendants' contention that the suit was brought maliciously. Specifically, defendants point to the partnership's current payments under the cash collateral agreement, as well as the current positive cash flow of the Quality Inn, to demonstrate plaintiff's desire to own and operate the Quality Inn as a profitable business.

In their final argument, defendants assert a counterclaim for emotional distress. They contend that threats of foreclosure and the filing of the action personally caused them severe mental and emotional distress. Because of the lawsuit, they are now faced with the possibility of bad credit and bankruptcy, both of which have caused an already precarious situation to worsen.

## DISCUSSION

■ The questions involved in this case are essentially ones of law for the Court. Generally, suits to enforce negotiable instruments are among the most suitable classes of cases for summary disposition. *See Lloyd v. Lawrence,* 472 F.2d 313 (5th Cir.1973). Because the case revolves around a negotiable instrument, a guaranty, its interpretation is first and foremost a question of law for the Court. Only after several canons of construction are applied, and fail, does the contract language itself become ambiguous, thereby warranting the decision-making powers of a jury. O.C.G.A. § 13–2–1 (1989); *Sims' Crane Service, Inc. v. Reliance Ins. Co.,* 514 F.Supp. 1033 (S.D.Ga.1981).

■ In determining whether summary judgment should issue in this case, the facts and their inferences are viewed in the light most favorable to the non-moving party and the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party typically must discharge its burden by producing evidence that negates an essential element of the non-moving party's claim. *See e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). Once the moving party has met this burden, however, the non-moving party may not rest on the allegations in its pleadings but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e). *See also*

*Thompson v. Metropolitan Multi–List, Inc.,* 934 F.2d 1566, 1583 n. 16 (11th Cir. 1991); *Johns v. Jarrard,* 927 F.2d 551, 555 (11th Cir.1991); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2739 (1983).

Recently, the Supreme Court noted that: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action'." *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555 (quoting Fed.R.Civ.P. 1). Thus, the non-moving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. "Where the record as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'." *Id.* at 587, 106 S.Ct. at 1356.

Plaintiff in this case has fulfilled its burden under the law. Because defendants have failed to show, by way of their various contentions, a genuine issue for trial, the Court is required to grant summary judgment.

## I. *Was There a Default?—A Question of Novation*

■ The present case falls completely in line with a recent Southern District of Georgia decision, *Federal Home Loan Mortgage Corp. v. Savannah Gardens— Oak Tree,* CV490–137, 1991 WL 420059 (S.D.Ga. Dec. 2, 1991). Similarly to the present situation, *Federal Home* involved a personal guaranty executed by general partners on behalf of a partnership to induce a loan. The partnership later defaulted on the loan and submitted to bankruptcy. During the bankruptcy proceedings, some adjustments were made to the loan which had the effect of discharging some of the debt. Although the bank retained a reservation of rights under the bankruptcy agreement, the defendants continued to argue that the agreement constituted an accord and satisfaction of the debt, thereby estopping the plaintiff from bringing suit on the guaranty.

Although the court did not address the issue of novation, the cases are comparable in principle so as to warrant similar conclusions. The court in *Federal Home* observed that, as a general rule, a lender can initiate proceedings against individual partners to fulfill their obligations even though the partnership is in bankruptcy. This follows the adage that a partnership can be adjudicated bankrupt separately from its partners, whether or not the partners are similarly adjudicated bankrupt as individuals. Consequently, when a bankruptcy proceeding is brought solely against the partnership, it cannot prevent the imposition of a suit against its partners individually for payment of their debts. *Id.* at 12.

■ Because a partnership is treated separately from its partners during bankruptcy, it necessarily follows that the guaranty will not be automatically discharged simply because agreements were made during the bankruptcy proceedings between the partnership and its creditors to reduce some of the debt. Such a result is supported when the circumstances show that the creditor reserved its rights to seek further relief when it entered the bankruptcy agreement. *Id.* at 12–13. Following this estoppel analysis, the Court is constrained to find that the actions taken by the parties in the present case do not affect the validity of the note and guaranty nor the defendants' underlying obligations.

The cash collateral agreement here, like the bankruptcy agreement in *Federal Home,* invoked language reserving plaintiff's rights:

Nothing in this Agreement shall be construed to constitute a waiver or admission by the Debtor that adequate protection is necessary or that any of the Secured Creditors have a perfected lien or security interest in the cash proceeds of the Property of the Debtor or a waiver or interest in and to the Debtor's property, including the Property, nor in any way prejudice the rights, remedies or claims of the Secured Creditor, including, without limitation their right to seek re-

lief from the automatic stay or adequate protection.

*In re Bouy, Hall & Howard and Associates, a Georgia Partnership,* Consent Order on Use of Cash Collateral, Bankruptcy No. 89–41946 ¶ 16 (S.D.Ga. June 18, 1990). Although the reservation focused principally on relief from the automatic stay and adequate protection, it used broad language to include a reservation of all rights, remedies or claims of plaintiff, as a secured creditor. These rights necessarily include the right to proceed on the guaranty entered by defendants notwithstanding the repayment scheme devised by the bankruptcy agreement.

This conclusion is supported by the language evident in the actual note, which defines the rights and obligations available to all parties. Pertinent here is a provision in the guaranty agreement which states that:

> WCC may renew or extend the indebtedness, or accept partial payment thereon, or settle, release, compound or compromise any of the same or collect on or otherwise liquidate any claims held by WCC in such manner as WCC may deem advisable, without impairing the liability of the Guarantor. Extensions of the times of payment, renewal of indebtedness, extensions of the times of performance of agreements and any other compromises, adjustments or indulgences may be granted to Obligor without notice to the Guarantor.

Guaranty Agreement at 1–2. Moreover, defendants, by entering into the guaranty agreement, specifically waived "any defense arising ... by reason of the cessation from any cause whatsoever of the liability of the Obligor" and "any rights to extension, composition or otherwise under the Bankruptcy Code or any amendments thereof, or under any state or other federal statute." *Id.* at 2.

▪ This language implies two important things. First, it demonstrates that the cash collateral agreement, in addition to theoretically not amounting to a novation, could not technically be considered a novation. Under Georgia law, any material alteration in the original loan contract, which is made without the knowledge or consent of the guarantor thereof, amounts to a novation thereby relieving the guarantor from liability. To constitute a novation under this definition, the alteration, in addition to being material, must be without the knowledge or consent of the guarantor, or it must increase the guarantor's risk. *Brunswick Nursing & Convalescent Center, Inc.,* 308 F.Supp. 297 (S.D.Ga.1970); *Dunlap v. Citizens & S. Dekalb Bank,* 134 Ga.App. 893, 216 S.E.2d 651 (1975); *H.C. Whitmer Co. v. Sheffield,* 51 Ga.App. 623, 181 S.E. 119 (1935). A guarantor may, however, consent in advance to a course of conduct which would otherwise result in discharge. *Dunlap,* 134 Ga.App. at 893, 216 S.E.2d 651.

▪ The language in the contract, therefore, necessarily implies knowledge and consent on behalf of the guarantors. Generally, a change in the guarantor's obligation is not considered to be a novation where the guarantor unconditionally guarantees payment on any renewal of the original obligation according to the terms of the renewal. *See Rice v. Georgia R.R. Bank & Trust Co.,* 183 Ga.App. 302, 358 S.E.2d 882 (1987); *Dever v. Lee,* 188 Ga. App. 483, 373 S.E.2d 224 (1988) (guaranty agreement signed by corporate vice-president expressly provided that he consented and agreed to extension, renewal, alteration, modification, or exchange of obligations or any writing, and that vice-president expressly waived notice of existence or creation of any or all obligations and, thus, corporate president's signing of new note did not discharge the vice-president from his obligation). Here, the contract specifically put the partners on notice that changes could be made without plaintiff formally being required to notify them. Such language constitutes automatic acceptance of the new terms.

Moreover, actual notice was received by defendants. They were the operating partners in the partnership. When the cash collateral agreement was executed, they were present and signed on behalf of the partnership. Even if they believed at the

time that they would not be called upon to pay on the guaranty, the result does not change—they knew that the payments were to be made in an effort to reduce the current obligations of the partnership. No promises were made to the partners that they would no longer be obligated under the guaranty, and the operation of the cash collateral agreement itself, as a plan devised to delegate the operating expenses of a bankrupt organization, could not imply that a change in the obligation had been made.

■■■ Secondly, in addition to knowledge, this language directs the Court's attention to the cash collateral agreement's failure to include any new consideration for revising the payment plan. The primary purpose behind the novation theory is to prevent any unwanted increase in the guarantor's exposure to risk or liability. Although a material change, whether to the guarantor's benefit or detriment, can constitute a novation, *Upshaw v. First State Bank,* 244 Ga. 433, 260 S.E.2d 483 (1979), where a change in payment does not change the ultimate liability of the guarantor, a novation is not necessarily deemed to take place. *See Citizens & Southern Nat. Bank v. Richardson,* 190 Ga.App. 36, 378 S.E.2d 159 (1989) (where guarantor's liability was limited to specified amount so that renewals could not have increased his risk or liability, fact that renewal of note was guaranteed to specified amount on different interest terms did not operate to discharge guaranty). This simply follows the theory that there is no novation where there is no new consideration. *Sens v. Decatur Fed. Sav. & Loan Ass'n,* 159 Ga. App. 767, 285 S.E.2d 226 (1981) (creditor's agreement to allow late payment is not additional consideration, as debtor's promise to pay debt already due creates no additional obligation).

In effect, all the partnership did through the cash collateral agreement was devise a way to pay its creditors what was already due them without depleting the source of the funds—the Quality Inn. The fact that payment was delayed does not result in a novation of the contract, absent additional consideration. *Columbia Nitrogen Corp. v. Mason,* 171 Ga.App. 685, 320 S.E.2d 838 (1984) (creditor's agreement to delay in payment by the giving of a promissory note for the balance due and accrued interest to be paid in four installments over a period of four and one-half years held not to constitute a novation); *Mitchell v. Ringson,* 169 Ga.App. 88, 311 S.E.2d 516 (1983) (guarantor held not discharged from obligation on promissory note as a result of payee's exceptions of untimely payments on the notes, in absence of showing of additional consideration which could result in novation); *Colodny v. Dominion Mortg. and Realty Trust,* 141 Ga.App. 139, 232 S.E.2d 601 (1977) (express provision in guaranty agreement prevented release of guarantors by extension of time of payment for an indefinite period of time). Here, although the Court does not believe that an actual extension of payment as contemplated by the contract took place, it is clear that the cash collateral agreement, by simply delaying the amounts due, does not constitute a novation of the original contract.

## II. *Good Faith*

■■■ Defendants believe that plaintiff's action in bringing this lawsuit at such a late date was made purely in bad faith. At the time this action was filed, the parties had already undergone the bankruptcy proceedings which delineated the mutually agreed upon payment plan. When the payments under this plan were first being made, the Quality Inn was suffering financially and was not, as a consequence, a "bargain." However, as time went on, and payments were kept current, the Quality Inn began to flourish and is now operating with a positive cash flow. It was not until this occurred that plaintiff filed suit. Defendants believe that plaintiff's sole purpose behind its action is to obtain the now profitable business.

As a basis for their belief, defendants point to deposition testimony by plaintiff's officials. With regard to a legal standpoint, defendants point to Georgia's version of the Uniform Commercial Code as establishing an obligation of good faith and fair

dealing on lenders. Defendants rely on O.C.G.A. § 11–1–208, which provides:

A term providing that one party or his successor in interest may accelerate payment or performance or require collateral or additional collateral "at will" or "when he deems himself insecure" or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised.

O.C.G.A. § 11–1–208 (1982). Plaintiff points out, accurately so, that this case does not involve the acceleration of the note. Rather, plaintiff is seeking payment from the guarantors for an amount which came due before suit was filed. No extensions were granted by way of the bankruptcy proceedings—the cash collateral agreement was a mere tool used by all concerned to keep the Quality Inn running as a viable business while at the same time being able to pay off its debts. Acceleration of the note had not even occurred at this time—plaintiff was merely protecting its interests. It was not until the note became due and payable that plaintiff sought recourse from defendants. Such an exercise of its rights cannot be found to have been accomplished in bad faith.

The situation is comparable to those involving demand notes. Demand notes do not fall under O.C.G.A. §.11–1–208 because, rather than the acceleration being dependent on whether the creditor believes in good faith that the prospect of performance is impaired, these instruments involve obligations whose very nature permits call at any time with or without reason. *Fulton Nat'l Bank v. Willis Denney Ford, Inc.*, 154 Ga.App. 846, 269 S.E.2d 916 (1980). The only obligation of good faith that exists, then, is the general obligation of good faith that exists in every contract. Although such an obligation exists, however, this duty does not by itself provide the basis for an independent cause of action. *Management Assistance, Inc. v.*

*Computer Dimension, Inc.*, 546 F.Supp. 666 (N.D.Ga.1982).

As a general rule, firms which have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being charged with lack of good faith. Simply because the obligation exists, it is not an invitation to the Court to decide whether one party should have exercised privileges expressly reserved in the contract. The purpose of the good faith rule is to prevent parties from taking an opportunistic advantage of each other in a way that could not have been contemplated at the time the contract was drafted. Thus, only that which is not regulated by the contract or resolved explicitly by the parties should be done in such a way as to show good faith in the carrying out of what is expressed. *Fulton Nat'l Bank*, 154 Ga. App. at 846, 269 S.E.2d 916; *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351 (7th Cir.1990).

Therefore, where the contract, such as a demand note, contains something that was specifically resolved by the parties, the good faith defense does not arise. In the demand note, the factor of acceleration is clearly specified—the due date is regulated by contract in that a demand instrument is due immediately. Thus, the only duty on a holder of a demand instrument is to seek enforcement of the instrument which is on its face immediately due and payable within the applicable statute of limitation. The obligor, by agreeing that his obligation is on its face immediately due and payable and subject to no other contingencies, cannot then contest the holder's decision to enforce payment anytime within the statute of limitation as being in bad faith. To allow for such a defense would be of no beneficial use. *Fulton Nat'l Bank*, 154 Ga.App. at 846, 269 S.E.2d 916.

Similarly here, the contract specified a date upon which the note would be due in full. Plaintiff cannot be held to have acted in bad faith by expecting that payment to be received in full. No extension, as defined by the note, was granted. The fact that plaintiff knew that the partnership

was in bankruptcy does not alter its right to proceed against the individual partners for collection of the debt. Moreover, the fact that plaintiff offered to take over the collateral, the Quality Inn, in lieu of payment of the debt is not indicative of plaintiff's good or bad intent. It merely represented an alternative solution to payment in full.

### III. *Emotional Distress*

In order to recover for intentional infliction of emotional distress under Georgia law, it must be demonstrated that defendant committed a "wanton, voluntary or intentional wrong the natural result of which is the causation of mental suffering." *Pierson v. News Group Publications, Inc.*, 549 F.Supp. 635 (D.C.Ga.1982). Generally, damages for mental distress are not recoverable unless the mental pain and suffering is accompanied by physical injury or pecuniary loss. However, where the tort claim does not lie in negligence but is for intentional misconduct, such as conduct that is malicious, willful or wanton, damages for mental distress may be recovered without proof of physical injury. *Hamilton v. Powell, Goldstein, Frazer & Murphy*, 252 Ga. 149, 311 S.E.2d 818 (1984); *U.S. Shoe Corp. v. Jones*, 149 Ga.App. 595, 255 S.E.2d 73 (1979).

To satisfy the intentional requirement, the acts need only evince a reckless and wanton disregard of their consequences. *Hamilton*, 252 Ga. at 149, 311 S.E.2d 818. The conduct must, however, be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency. The conduct must be regarded as atrocious and utterly intolerable in a civilized community. *Mundy v. Southern Bell Tel. & Tel. Co.*, 676 F.2d 503 (11th Cir.1982). Thus, it is clear that not all reproachful behavior will provide a claim for this type of tort—the actions of defendant must be so terrifying or insulting as naturally to humiliate, embarrass, or frighten plaintiff. *Cummings v. Walsh Const. Co.*, 561 F.Supp. 872 (D.C.Ga.1983); *Savell, Williams, Cox & Angel v. Coddington*, 176 Ga.App. 179, 335 S.E.2d 436

(1985); *Arrowsmith v. Williams*, 174 Ga. App. 690, 331 S.E.2d 30 (1985); *Sossenko v. Michelin Tire Corp.*, 172 Ga.App. 771, 324 S.E.2d 593 (1984); *East River Sav. Bank v. Steele*, 169 Ga.App. 9, 311 S.E.2d 189 (1983).

The conduct described here, that of threatening foreclosure on the loan and instigating the present action, does not amount to such outrageous conduct necessary to recover for emotional distress. Moreover, where recovery is based upon humiliation, it must be shown that the facts and circumstances were such as would likely humiliate and insult any person in like circumstances. *Anderson v. Atlanta Newspapers, Inc.*, 212 Ga. 776, 95 S.E.2d 847 (1957); *Hayes v. Irwin*, 541 F.Supp. 397 (D.C.Ga.), *aff'd*, 729 F.2d 1466, *cert. denied*, 469 U.S. 857, 105 S.Ct. 185, 83 L.Ed.2d 119 (1982). Plaintiff's actions, as a matter of law, were not so severe that a reasonable person could not have endured the degree of distress generated therefrom.

It is well understood that the mere filing of a lawsuit is not the type of humiliation, insulting or terrifying conduct which will give rise to a claim for intentional infliction of emotional distress. *Savell, Williams*, 176 Ga.App. at 179, 335 S.E.2d 436; *Rolleston v. Huie*, 198 Ga.App. 49, 400 S.E.2d 349 (1990); *Georgia Power Co. v. Johnson*, 155 Ga.App. 862, 274 S.E.2d 17 (1980) (preparation and filing of legal pleadings could not reasonably be characterized as humiliating, insulting or terrifying). Additionally, a bank's threats to foreclose on property owned by a partnership has not been found to amount to intentional infliction of emotional distress upon the partner personally. Allegations of such wrongful foreclosures are considered analogous to the filing of legal pleadings and are therefore insufficiently severe to come within the ambit of the emotional distress cause of action. *East River Savings Bank v. Steele*, 169 Ga.App. 9, 311 S.E.2d 189 (1983) (alleged wrongful foreclosure of partnership assets and threatened prosecution for perjury held not sufficient to sustain action for intentional inflic-

tion of emotional distress). Accordingly, the Court finds no merit to defendants' emotional distress allegations.

## IV. *Abusive Litigation*

Defendants assert that plaintiff has maliciously *used* the process of this Court to obtain ownership of the Quality Inn business. In its motion for summary judgment, plaintiff gives a haphazard explanation and attempts to set forth the standard for an action for *abuse* of process, rather than discussing malicious *use* of process. In the past, the tort of malicious abuse of process was established under Georgia common law and occurred when a plaintiff in a civil action wilfully misapplied process to obtain an object which such process could not effect under the law. Proof of the tort was shown through evidence of an ulterior purpose and an act in the use of process which was not proper in the regular prosecution of the proceedings. *See United States v. Chatham,* 415 F.Supp. 1214 (D.C.Ga.1976). The critical element of abuse of civil process was that an action for improper use of process arose after process had been issued, not for maliciously causing it to issue. *Thomas v. Ronald A. Edwards Const. Co.,* 163 Ga.App. 202, 293 S.E.2d 383 (App.1982).

Malicious *use* of process, on the other hand, was a similar tort action which could be brought only after the previous litigation finally terminated against the party who instituted that litigation. Such an action would lie when a party employed a civil proceeding in order to execute the object which the law intended, but proceeded maliciously and without probable cause. *Dixie Broadcasting Corp. v. Rivers,* 209 Ga. 98, 70 S.E.2d 734 (1952). The principal distinction between the two is that malicious *abuse* of process lies for wrongfully and unlawfully using legally and properly issued process for a purpose that the law never intended it to effect, whereas mali-

cious *use* of process would lie in instances where a party maliciously sued out civil process without probable cause. *Morris v. Lester Laboratories, Inc.,* 147 Ga.App. 833, 250 S.E.2d 569 (1978).

Today, both the actions for malicious use and abuse of process have been merged into Georgia's abusive litigation tort, codified at O.C.G.A. § 51–7–80 *et seq.*[1] O.C.G.A. § 51–7–81 provides that "any person who takes an active part in the initiation, continuation, or procurement of civil proceedings against another shall be liable for abusive litigation if such person acts: (1) with malice; and (2) without substantial justification." "Malice" is defined in O.C.G.A. § 51–7–80(5) as

acting with ill will or for a wrongful purpose and may be inferred in an action if the party initiated, continued, or procured civil proceedings or process in a harassing manner or used process for a purpose other than that of securing the proper adjudication of the claim upon which the proceedings are based.

"Without substantial justification," when used with reference to any civil proceeding, claim, defense, motion, appeal, or other position, as defined in O.C.G.A. § 51–7–80(7), means

that such civil proceeding, claim defense, motion, appeal, or other position is:

(A) frivolous;

(B) groundless in fact or law; or

(C) vexatious.

The malice alleged here focuses on plaintiff's actions as being for a wrongful purpose. Plaintiff is accused of "attempting to unjustifiably accomplish some ulterior or collateral purpose other than resolving the subject controversy on its merits." *See* O.C.G.A. § 51–7–80(8). As evidence of plaintiff's intent, defendants point to the fact that the business had returned to profitability at the time the suit was filed. What defendants omit from their allega-

---

1. In addition, O.C.G.A. § 9–15–14 provides for an action solely for attorneys' fees and expenses of litigation in the event of abusive litigation. This statute was in effect the same time the common law *Yost v. Torok,* 256 Ga. 92, 344 S.E.2d 414 (1986), abusive litigation actions were used. Now that the common law action has been codified in O.C.G.A. § 51–7–80, *et seq,* O.C.G.A. § 9–15–14 remains effective only when the claim is for attorneys' fees or expenses of litigation.

tions is the guaranty contract itself which gives plaintiff the legal right to pursue an action against defendants as well as the factual disparity that the partnership is still in bankruptcy. Substantively, this Court believes that defendants' claim holds little weight.

Notwithstanding its belief that defendants' claim lacks substance, the Court finds that defendants have asserted their claim at an improper time under the statute, and, consequently, their claim for abusive litigation is dismissed. O.C.G.A. § 51-7-84(a) requires that one asserting a claim for abusive litigation must send a notice of the claim to the other party as a condition precedent to the claim. *See Jones v. Bienert,* 197 Ga.App. 554, 398 S.E.2d 830 (1990). Because there is no evidence that such was done in this case, any claim for abusive litigation must be dismissed. Further, O.C.G.A. § 51-7-84(c) requires the final termination of the proceeding in which the alleged abusive litigation occurred and must be brought within one year of the date of final termination. Only if the abusive litigation is in a "civil proceeding of a court of record and no damages, other costs and expenses of litigation and reasonable attorneys' fees are claimed," can the procedures in O.C.G.A. § 9-15-14, be utilized and a counterclaim be asserted.

 In their response to plaintiff's motion for summary judgment, defendants contend that the basis of their counterclaim was O.C.G.A. § 9-15-14, and, as a result, they are entitled to proceed with their claim in seeking expenses of litigation and

attorneys' fees. Although not asserted in their counterclaim in that manner, O.C.G.A. § 9-15-14 provides for attorneys' fees and expenses of litigation against a party that asserted a claim with respect to which there existed "such a complete absence of any justiciable issue of law or fact that it could not be reasonably believed that a court would accept the asserted claim." Again, if the party is found to have lacked substantial justification for its action, such that the claim was substantially frivolous, substantially groundless or substantially vexatious, attorneys' fees and expenses may be granted. However, federal courts interpreting this section have found it to apply *only* to courts of record of the State of Georgia; this section is unavailable to civil litigants in federal court. *Union Carbide Corp. v. Tarancon Corp.,* 682 F.Supp. 535 (N.D.Ga.1988); *Bruce v. Wal-Mart Stores, Inc.,* 699 F.Supp. 905 (N.D.Ga. 1988); *Thomas v. Brown,* 708 F.Supp. 336 (N.D.Ga.1989); *Edwards v. Associated Bureaus, Inc.,* 128 F.R.D. 682 (N.D.Ga.1989). Consequently, any claim by defendants alluding to a remedy under O.C.G.A. § 9-15-14 cannot be brought in this Court.[2]

V. *Attorneys' Fees*

 In the guaranty agreement, the guarantors agreed "to reimburse WCC, to the extent that such reimbursement is not made by Obligor, for all expenses (including reasonable attorneys' fees) incurred by WCC in collection of the Indebtedness hereby guaranteed and in the enforcement of this Guaranty." Pursuant to O.C.G.A.

---

**2.** It is uncertain whether the same principles applicable to O.C.G.A. § 9-15-14 would equally apply to an action brought under O.C.G.A. § 51-7-80. Notably, those cases that denied federal jurisdiction for claims under O.C.G.A. § 9-15-14 argued that the *Yost* counterclaims were similarly inappropriate for federal court. The courts analyzed that abusive litigation claims are procedural rather than substantive, and, therefore, federal courts need not follow the state law provisions for bringing them. Because Georgia's provisions could run counter to the provisions of federal law's Rule 11, and since Rule 11 provides adequate safeguards against just the abuses that *Yost* attempts to protect against, there is no need to entertain *Yost* claims in federal court. *Thomas,* 708

F.Supp. at 338-39; *Union Carbide Corp.,* 682 F.Supp. at 544-46; *but see Chromatics, Inc. v. Telex Computer Products, Inc.,* 695 F.Supp. 1184 (N.D.Ga.1988).

Now that *Yost* has been superseded by O.C.G.A. § 51-7-80, the same procedural/substantive argument can be made here. Although the statute does not limit jurisdiction of the claims to a court *in the state,* by analogy to *Yost,* all actions involve the same legislative language used in O.C.G.A. § 9-15-14, which does confine the cause of action to courts of record of the State of Georgia. Regardless of the propriety of any O.C.G.A. § 51-7-80 claim before this Court, it is clear that defendants have not fulfilled their obligations under the statute as stated, and, for that reason, the claim has been dismissed.

§ 13-1-11, promissory notes authorizing attorneys' fees when the note is collected by and through an attorney are valid, enforceable and collectible. *Camacho v. First S. Homeowners Co.*, 160 Ga.App. 491, 287 S.E.2d 327 (1981). The statute is applicable to "obligations to pay attorneys' fees upon any note or other evidence of indebtedness," O.C.G.A. § 13-1-11(a), such as the guaranty here.

Where the note, as in the case at bar, provides for the payment of reasonable attorneys' fees without designating any specific percent, the provision is construed to mean 15 percent of the first $500.00 of principal and interest owing on the note and 10 percent of the amount of principal and interest remaining in excess of that $500.00. O.C.G.A. § 13-1-11(a)(2). Because the guaranty here provided only for reasonable attorneys' fees, this portion of the statute is applicable.

The only other requirement that must be fulfilled before attorneys' fees can be awarded is a notice provision found under O.C.G.A. § 13-1-11(a)(3). That section provides that the holder of the note or his attorney shall, after maturity of the obligation, notify in writing the party sought to be held on the obligation that the provisions relating to attorneys' fees will be enforced. The holder of the note or his attorney must give that party ten days from the date of receipt of the notice to pay the principal and interest without the penalty of attorneys' fees. O.C.G.A. § 13-1-11(a)(3). Having complied with this section by way of its complaint, plaintiff has fulfilled all of its obligations, and attorneys' fees will be awarded as designated by the statute.

CONCLUSION

Based upon the foregoing analysis,

IT IS HEREBY ORDERED that plaintiff's motion for summary judgment be and is GRANTED. The Clerk of the Court is hereby ordered to enter judgment in favor on plaintiff in the amount of $1,584,846.00 less any amounts paid pursuant to the cash collateral agreement as principal and an additional $71,116.24 as interest due and owing.

IT IS FURTHER ORDERED that defendants' counterclaims for emotional distress and abusive litigation be and are DISMISSED.

IT IS FURTHER ORDERED that defendants, per their duly executed guaranty, be and are liable for plaintiff's costs and reasonable attorneys' fees incurred by plaintiff in the collection and enforcement of the guaranty. Pursuant to O.C.G.A. § 13-1-11(2), defendants are required to pay attorneys' fees in the amount of $165,621.20. The Clerk of the Court is directed to enter an appropriate judgment.